Andrew K. Alper (State Bar No. 088876)
aalper@frandzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 Wilshire Boulevard, Nineteenth Floor
Los Angeles, California 90017-2427
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Plaintiff, Regions Bank
An Alabama State Bank dba Ascentium Capital

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| REGIONS BANK, an Alabama State Bank dba ASCENTIUM CAPITAL, <br><br> Plaintiff, <br><br> v. <br><br> CAR WASH MANAGEMENT, LLC, a Delaware Limited Liability Company, CAR WASH MANAGEMENT, LLC, a Hawaii Limited Liability Company, WEST COVINA CAR WASH LLC, a California Limited Liability Company, JOSE RENE ORTIZ, aka JOSE R. ORTIZ, aka JOSE ORTIZ, an individual, ANDREW PAUL WILLIAMS, aka ANDREW P. WILLIAMS, aka ANDREW WILLIAMS, an individual, WASHWORLD, INC., a Wisconsin Corporation, DOES 1-100, inclusive, <br><br> Defendants. | Case No.  2:25-cv-00359 CAS KSx) <br><br> **NOTICE OF MOTION AND MOTION OF PLAINTIFF AND COUNTER-DEFENDANT REGIONS BANK FOR LEAVE TO FILE FIRST AMENDED COMPLAINT (F.R.C.P. Rule 15); MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF ANDREW K. ALPER; AND PROPOSED FIRST AMENDED COMPLAINT FILED CONCURRENTLY HEREWITH** <br><br> Date:     March 23, 2026 <br> Time:    10:00 a.m. <br> Crtrm.:  8D |
| JOSE RENE ORTIZ, <br><br> Cross-Complaint, <br><br> v. <br><br> ANDREW PAUL WILLIAMS, CAR WASH MANAGEMENT, LLC, CAR WASH MANAGEMENT, LLC, WASHWORLD, INC., and ROES 1 to | |

5851944v1 | 100287-0289

NOTICE OF MOTION AND MOTION OF PLAINTIFF AND COUNTER-DEFENDANT REGIONS BANK
FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

35, inclusive,

   Cross Defendants.

WASHWORLD, INC.,

   Plaintiff,

  v.

CAR WASH MANAGEMENT LLC

   Cross-Defendant.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

TO THE COURT, AND TO ALL OTHER INTERESTED PARTIES AND THEIR COUNSEL:

NOTICE IS HEREBY GIVEN that on March 23, 2026, at 10:00 a.m. or as soon thereafter as counsel may be heard in the above-entitled Court located at 350 W 1st Street, Suite 4311 Los Angeles, CA 90012-4565 in Courtroom 8D of the Honorable Christina Snyder, Plaintiff and Counter-defendant Regions Bank dba Ascentium Capital ("Plaintiff") will and does hereby move this Court for an order allowing Plaintiff leave to file a First Amended Complaint ("FAC'), a copy of which is attached hereto as Exhibit "1" pursuant to Federal Rules of Civil Procedure (F.R.C.P..) Rule 15.  Specifically, the First Amended Complaint seeks to add new facts not known at the time the original complaint was filed and to add an additional claim for relief for conversion against Defendant and Counter-Claimant Washworld, Inc. ("Washworld").  The facts which form the basis of the FAC were obtained from pleadings and motions filed during this case and discovery responses and documents produced by Washworld.  A redlined version of the proposed FAC (without exhibits) is attached hereto as Exhibit "2".

The motion is made pursuant to Federal Rules of Civil Procedure, Rule 15. The motion is further based on the memorandum of points and authorities filed concurrently herewith, on the Declaration of Andrew K. Alper filed concurrently

5851944v1 | 100287-0289

2

herewith, the orders and other pleadings and files of the Court referred of which Plaintiff requests the Court take judicial notice pursuant to Rule 201 of the Federal Rules of Evidence, on the proposed FAC, and on such other evidence and arguments as may be presented to the Court at the time of any hearing on the motion.

DATED:  February 20, 2026        FRANDZEL ROBINS BLOOM & CSATO, L.C.

By: _____
ANDREW K. ALPER
Attorneys for Plaintiff, Regions Bank,
an Alabama State Bank dba Ascentium
Capital

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Car Wash Management, LLC ("CWM") entered into Equipment Financing Agreement No. 2763169 (the "EFA") with Plaintiff in order for Plaintiff to make a loan to CWM to finance the acquisition of car wash equipment for the financed amount of $343,394.23 with respect to equipment presumably being acquired by CWM initially from AVW Equipment Company, Inc. ("AVW"), its equipment supplier. Pursuant to the terms of the EFA, after an initial payment, CWM was required to make 71 monthly payments until the loan was paid in full.  In connection with execution of the EFA, CWM also executed, among other documents, an Authorization to Perform Verbal Verification, Prepayment Addendum, Authority and Incumbency Certificate, Delivery and Acceptance Certificate, and Commencement Agreement whereby CWM requested that Plaintiff pay the supplier of the Equipment which was AVW. The loan was also personally guaranteed by Defendant and Cross-defendant Jose Rene Ortiz ("Ortiz") and another entity known as West Covina Car Wash ("WCCW").

Initially the equipment was to have been ordered through AVM but according to CWM when AVW could not timely deliver all of the equipment CWM by and through CEO Andrew Williams ("Williams") the supplier was changed to Washworld, Inc. ("Washworld").  The EFA was amended to reflect modified payment terms after it was initially executed and the change to the Washworld equipment and also an Addenda to the EFA was executed lightly increasing the amount of the funding and the payments.

In addition, CWM was a distributor of Washworld equipment and, according to Washworld, distributors have access to Washworld's order forms to order equipment.  In order for Plaintiff to pay the loan proceeds for its borrower (or any Washworld customer acquiring Washworld equipment) directly to Washworld to acquire the equipment so Washworld would be paid for the sale of its equipment

MOTION OF PLAINTIFF AND COUNTER-DEFENDANT REGIONS BANK FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

Washworld had executed a simple one page contract with Plaintiff called Funding Instructions, which sets forth the specific terms under which Plaintiff would pay Washworld the proceeds for any loans being financed so Plaintiff's borrower and Washworld's customer (in this case CWM) so the equipment would be paid for and there would be no outstanding balance due to Washworld and the equipment would then be delivered to CWM.  As a result of receiving the Washworld order for the CWM equipment, which was the subject of the loan, Plaintiff paid the initial sum of $309,054.80 to Washworld.  The Funding Instructions state, among other terms:

> "Payee [Washworld] agrees any funds received from Ascentium [Plaintiff] are for the sole purpose of advancing funds for Payee's customer to pay the purchase orders, invoices, quotes, or proposals for the application transaction.  If funds to which Payee is not entitled are deposited into Payee's account or otherwise received by Payee, Payee agrees to promptly remit any such funds to or as directed by Ascentium [Plaintiff]."

The Commencement Agreement in this case was executed because the borrower wants the loan commenced and requests that the lender fund the supplier of the equipment even though the equipment has not been received. As stated: "The Collateral is being delivered to you at various times and the supplier(s) and vendor(s) …of the Collateral have to be paid for each item of Collateral at or before delivery to you….and the Agreement is non-cancellable and in full force and effect… immediately though even though items of Collateral remain to be delivered to you…." The Commencement Agreement then goes on to state the contractual terms which allowed and requested that Plaintiff pay the supplier which was Washworld even though the equipment had not been delivered.  Therefore, once this Commencement Agreement was signed, Plaintiff no longer required another Delivery and Acceptance Certificate like the one signed with AVW.

In addition, Plaintiff orally verified with Ortiz that the Washworld equipment had been delivered and that it could fund Washworld.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

MOTION OF PLAINTIFF AND COUNTER-DEFENDANT REGIONS BANK FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT

On March 11, 2024, when Plaintiff paid the sum of $309,054.80 to Washworld it also issued a document called Payment Notification which stated the name of the customer, the applicable contract number, the amount wired to Washworld and the name of the person for Washworld to contact if it had any questions or issues regarding this payment or the transaction. This is not the first time that Plaintiff and Washworld had done business. Almost every transaction between Washworld and Plaintiff was done the same way and had a similar Payment Notification. Plaintiff had funded around 20 such transactions with Washworld.

Washworld never delivered the equipment that is the subject of the Purchase Order sent to Plaintiff to reflect the equipment being sold to CWM. Notwithstanding the fact that Washworld never delivered the equipment that was the subject of the purchase order, CWM orally represented to Plaintiff that it in fact received that equipment.

After Washworld received the $309,054.80 from Plaintiff for the purchase by CWM on the specific order submitted to Plaintiff, instead of contacting Plaintiff to ask why Washworld was receiving this money, Washworld inexplicably contacted CWM its distributor and customer and possibly acts as an agent of Washworld and not Plaintiff with respect to why this money was being received. According to Washworld, Williams told Washworld that $132,509.09 of the $309,054.80 was to fund a different order for a customer of Washworld and CWM called Conserve Fuels totally unrelated to the loan being made by Plaintiff where allegedly there was an outstanding order open and Washworld was owed this sum.  Washworld then was told that the rest of the money was for the purpose of acquiring "ancillary" equipment not from Washworld but from a different supplier. Therefore, Washworld sent the balance of $176,552.71 to CWM ignoring the terms of the Funding Instructions contract which required Washworld to return to Plaintiff any funds that Washworld is not entitled to the money unless it was for the purchase of new

5851944v1 | 100287-0289

6

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

equipment being sold by Washworld to its customer.  Why Washworld would be receiving the balance of the $309,054.80 for other non-Washworld equipment defies any logic and Washworld should have known that. But again, Washworld chose not to contact Plaintiff about the money. Plaintiff has now learned in this case that Washworld actually paid CWM the $176,552.71 as a commission on the Conserv Fuels transaction and not what Washworld represented to Plaintiff once Plaintiff discovered the fraud.

Originally based upon the facts known to Plaintiff at the time of the filing of the Complaint, Plaintiff filed its complaint alleging claims for relief for Breach of Equipment Finance Agreement, Breach of Guaranty, Breach of Guaranty, Fraud/Concealment, Recovery For Payment of Money By Mistake, Unjust Enrichment, Breach of Contract and Money Had and Received.

Plaintiff propounded discovery to Washworld and learned facts that were not in the Complaint. However, the discovery responses and production of documents are not complete and Plaintiff and Washworld are meeting and conferring as to discovery issues. Another issue which has arisen is the fact that many documents were produced by Washworld in accordance with a Protective Order issued by the Court as "Confidential". This has caused further issues because without a change in the designation of those documents and if Washworld continues to believe that these documents are confidential Plaintiff cannot introduce them in Court and either needs to file them under seal or file a Motion with the Court to change the designation to not Confidential. Because of these pending issues and problems, Plaintiff did not want to file this Amended Complaint at this time because it wanted to complete more discovery in which there is a roadblock placed by Washworld.  Plaintiff approached Washworld to agree to stipulate to continue the motion to amend pleadings cutoff date, and although Washworld agreed to a 30 day extension depending on what happens to the rest of the dates in the Scheduling Order, Washworld also stated that it is not waiving any right to oppose leave to file an

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

Amended Complaint. While Plaintiff indicated that Washworld should so stipulate to no less than 60 days to see if the parties can work out the issues, Washworld would not do that. Counsel for Ortiz has agreed to any time needed by Plaintiff to amend the Complaint.  Therefore, having no alternative and while this may not be the Amended Complaint including all parties and Claims that Plaintiff needs to file since the cutoff date for the Motion for Leave to Amend is February 26, 2026, Plaintiff has little choice but to amend by that date given the position of Washworld. Therefore, by this motion Plaintiff seeks to amend its complaint to add facts and another Claim. In summary. The facts added are that CWM, in connection with the fraud upon the Plaintiff orally represented to Plaintiff that it had received the equipment from Washworld even though it never did; that Washworld failed to disclose that the $176, 552.71 was paid to CWM as a commission; and finally, as a result of these facts, include an additional Claim for relief against Washworld for conversion.

## II.      LEGAL STANDARDS

Rule 15 provides that a court should "freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15(a)(2).. "This policy is applied with `extraordinary liberality.' *Patagonia, Inc. v. Anheuser-Busch, LLC,* No. 19CV2702VAPJEMX, 2020 WL 12048990, at *2 (C.D. Cal. July 27, 2020) (citing *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990)).

"In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."' *Foman v. Davis,* 371 U.S. 178, 182 (1962). "Absent prejudice, or a strong showing of the remaining factors, 'there exists a presumption under Rule 15(a) in favor of granting leave to amend."' *Patagonia, Inc.*, 2020 WL 12048990, at *2 (quoting *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003)).

MOTION OF PLAINTIFF AND COUNTER-DEFENDANT REGIONS BANK FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

There is no time limit for amendment under FRCP 15(a)(2).  Thus, leave to amend may be sought any time before entry of judgment.  The policy of amendment is to be applied with "extreme liberality" (*Sonoma County Ass'n of Retired Employees v. Sonoma County* (9th Cir. 2013) 708 F. 3d 1109, 1117) as stated above. Further, amendments seeking to add claims are to be granted more freely than amendments adding parties (*Union Pac. R.R. Co. v. Nevada Power Co*. (9th Cir. 1991) 950 F. 2d 1429, 1432).  The parties seeking leave to amend need only establish the reason why amendment is required ("justice" so requires).  The burden is then on the party opposing the motion to convince the Court that "justice" requires denial – i.e. because of undue delay, bad faith, prejudice, etc. (See *Shipner v. Eastern Airlines, Inc*. (11th Cir. 1989) 868 F. 2d 401, 406-407; *Clarke v. Upton* (E.D. CA 2010) 703 F. Supp. 2d 1037, 1041).

In this case the Scheduling Order limits the filing of amended pleadings must be done by February 27, 2026. Plaintiff remains ready, willing and able to stipulate to the filing of the Amended Complaint without prejudicing any party's right to file a response including a Rule 12(b)(6) motion if they do not believe the Amended Complaint states a Claim. Washworld has not indicate a willingness to do this which necessitates this Motion delaying the case further. Plaintiff is also willing to extend out all other dates in the Court's Scheduling to allow for new pleadings, the fact that parties who have been defaulted will have to be served and then if they default again have default entered or if they appear that may change the scheduling of the dates in this case.  Plaintiff therefore offers that all other dates be continued 90 days but it is amenable to different dates to change the dates in the Scheduling Order. Furthermore, the discovery and Confidentiality Issues also have to be determined and there is no guaranty that once discovery is further along that another Amended Complaint may not be filed.

## III.   ARGUMENT

Consistent with the longstanding policy the "disputes should be determined

MOTION OF PLAINTIFF AND COUNTER-DEFENDANT REGIONS BANK FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT

on the merits," (*Foman*, 371 U.S. 181-182) and this court should allow Plaintiff to file the FAC.

Allowing the amendment will not cause any prejudice to any of the parties-discovery is still ongoing and as set forth in the Declaration of Andrew K. Alper filed concurrently herewith, counsel for Defendant, cross-complainant, and Cross-defendant Ortiz agreed to stipulate to the filing of the FAC or to give more time to extend the date when the amended pleadings will be due. Unfortunately, counsel for Washworld refused to act reasonably necessitating this Motion.

For the foregoing reasons, Plaintiff requests that the Court grant its Motion for Leave to File it's First Amended Answer.

DATED:  February 20, 2026          FRANDZEL ROBINS BLOOM & CSATO, L.C.

By: _____
ANDREW K. ALPER
Attorneys for Plaintiff, Regions Bank
an Alabama State Bank dba Ascentium
Capital

5851944v1 | 100287-0289                    10

MOTION OF PLAINTIFF AND COUNTER-DEFENDANT REGIONS BANK FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel of record for Plaintiff and Counter-Defendant Regions Bank, an Alabama State Bank dba Ascentium Capital, certifies that this brief (including headings, footnotes, and quotations but excluding the caption, the signature block, and this certification) contains 2,735 words, which complies with the word limit of L.R. 11-6.1.

DATED:  February 20, 2026          FRANDZEL ROBINS BLOOM & CSATO, L.C.

By: _____
ANDREW K. ALPER
Attorneys for Plaintiff, Regions Bank
an Alabama State Bank dba Ascentium
Capital

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

MOTION OF PLAINTIFF AND COUNTER-DEFENDANT REGIONS BANK FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT

# EXHIBIT 1

Andrew K. Alper (State Bar No. 088876)
aalper@frandzel.com
Thomas M. Robins (State Bar No. 054423)
trobins@frandzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 Wilshire Boulevard, Nineteenth Floor
Los Angeles, California 90017-2427
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Plaintiff,
REGIONS BANK, an Alabama State
Bank, dba Ascentium Capital

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| REGIONS BANK, an Alabama State Bank dba ASCENTIUM CAPITAL,<br><br>                    Plaintiff,<br><br>          v.<br><br>CAR WASH MANAGEMENT, LLC, a Delaware Limited Liability Company, CAR WASH MANAGEMENT, LLC, a Hawaii Limited Liability Company, WEST COVINA CAR WASH LLC, a California Limited Liability Company, JOSE RENE ORTIZ, aka JOSE R. ORTIZ, aka JOSE ORTIZ, an individual, ANDREW PAUL WILLIAMS, aka ANDREW P. WILLIAMS, aka ANDREW WILLIAMS, an individual, WASHWORLD, INC., a Wisconsin Corporation, DOES 1-100, inclusive,<br><br>                    Defendants. | **Case No. 25-CV-00359 CAS (KSx)**<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>1.  **BREACH OF EQUIPMENT FINANCE AGREEMENT**<br><br>2.  **BREACH OF GUARANTY**<br><br>3.  **BREACH OF GUARANTY**<br><br>4.  **FRAUD/CONCEALMENT**<br><br>5.  **RECOVERY FOR PAYMENT OF MONEY BY MISTAKE, UNJUST ENRICHMENT**<br><br>6.  **BREACH OF CONTRACT**<br><br>7.  **MONEY HAD AND RECEIVED**<br><br>8.   **CONVERSION** |

5852240v1 | 100287-0289

1

COMPLAINT

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

Plaintiff complains as follows:

## GENERAL ALLEGATIONS

### A.    Parties

1.    At all times herein mentioned, Plaintiff Regions Bank was and is an Alabama State Bank with its principal place of business in the State of Alabama. Regions Bank is doing business under the name of Ascentium Capital.  At all times herein mentioned Regions Bank is and has been qualified to conduct business in the State of California and is referred to herein as "Ascentium."

2.    Ascentium is informed and believes and therein alleges that at all times herein mentioned, Defendant Car Wash Management, LLC was and is a limited liability company, organized and existing under the laws of the State of Delaware with its principal place of business in the City of West Covina, County of Los Angeles, State of California ("CWM" or "Debtor"). Ascentium also is informed and believes and therein alleges that at all times herein mentioned there exists, or at one time existed, a Hawaii limited liability company with the name Car Wash Management, LLC, which had or has one or more of the same members / managers as the Delaware entity.  While Ascentium believes that the contracting entity in this case was and is the Delaware entity, whenever reference is made to "Debtor" or "CWM" it shall be deemed to collectively refer to both entities. Ascentium is further informed and believes and thereon alleges that there are no members who are citizens of the State of Alabama.

3.    Ascentium is informed and believes and therein alleges that at all times herein mentioned Defendant West Covina Car Wash LLC was and is a limited liability company, organized and existing under the laws of the State of California with its principal place of business in the City of West Covina, County of Los Angeles, State of California whose sole member is CWM ("WCCW"). Ascentium is informed and believes and thereon alleges that there are no members of WCCW who are residents of the State of Alabama. In fact, Ascentium is informed and believes and thereon alleges that its sole member is CWM.

4.    At all times herein mentioned, Defendant Jose Rene Ortiz, aka Jose R. Ortiz; aka Jose Ortiz ("Ortiz"), was and is an individual who was and is a member of CWM and resides in

the City of West Covina, County of Los Angeles, State of California.

5.     At all times herein mentioned, Defendant Andrew Paul Williams, aka Andrew P. Williams, aka Andrew Williams ("Williams") was and is an individual who was and is a member and/or officer of CWM and resides in the County of San Diego, State of California.

6.     Ascentium is informed and believes and therein alleges that at all times herein mentioned, Defendant Washworld, Inc. was and is a corporation organized and existing under the laws of the State of Wisconsin with its principal place of business in Wisconsin and is authorized to and doing business in the County of Los Angeles, State of California ("Washworld"). Ascentium is informed and believes and thereon alleges that no officers or directors are residents of the State of Alabama.

7.     The true names and capacities, whether individual, corporate, partnership, association, limited liability company or otherwise are unknown to Ascentium who therefore sues such defendants by such fictitious names as Does 1-100, Inclusive.  Ascentium is informed and believes and thereon alleges that no fictitiously named Defendant is a resident or citizen of Alabama. Ascentium is informed and believes and therein alleges that each of the fictitiously named defendants is in some manner responsible for the events and damages alleged herein. When the true names and capacities and connection of such fictitious defendants are ascertained, Ascentium will seek leave to amend this complaint accordingly or will name such defendants as a Doe defendant.

8.     Ascentium is informed and believes and therein alleges that at all times herein mentioned each of the defendants that is named in the caption of this Complaint was and/or is the agent, officer, employee, joint venturer, aider and abettor and/or co-conspirator of each other defendants, and in acting and/or failing to act as alleged herein, was so doing in the course and scope of such capacity and relationship.

**B.     Jurisdiction and Venue**

9.     Jurisdiction is proper under 28 U.S.C. §1332(a) in that there is complete diversity of citizenship between Ascentium and all Defendants and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

10. Venue is proper in this Court because a substantial part of the events or omissions giving rise to the causes of action in this Complaint occurred in this District in Los Angeles County, California and  Defendant Ortiz resides in this District and defendants CWM and WCCW do business in this District. In addition, Plaintiff is informed and believes that the personal property which is the subject of the allegations in this case may be within this Judicial District.

11. This action is not subject to the provisions of Section 2981, et seq. (Rees-Levering Act) and/or Section 1801 et seq. (Unruh Act) of the Civil Code of the State of California.

**C.      The CWM Equipment Finance Agreement**

12. On or about January 10, 2024, CWM, as "Debtor," with a listed address of 310 S. Vincent Ave., West Covina, CA 91790, entered into Equipment Financing Agreement No. 2763169 (the "EFA") with Ascentium in order to finance the acquisition of equipment for the financed amount of $343,394.23 to be repaid with one initial payment of $34,339.71 and 71 monthly payments of $5,918.76.  CWM is also sometimes referred to herein not only as CWM but as Debtor.  In connection with execution of the EFA, Debtor also executed the following documents:  Authorization to Perform Verbal Verification, Prepayment Addendum, Authority and Incumbency Certificate,  and Commencement Agreement whereby Debtor requested that Ascentium pay the supplier of the Equipment before the Equipment was delivered, installed and operational.  True and correct copies of the EFA and the other documents described in this paragraph are attached hereto collectively as Exhibit "1" and incorporated herein by this reference. Reference to the "EFA" shall include all of the documents described in this paragraph.  The EFA was to finance Debtor's purchase of equipment for the operation of a car wash initially from a vendor identified as AVW Equipment Company, Inc. ("AVW").  Pursuant to the EFA, Ascentium wired $309,054.80 of the $343,394.23 to AVW.

**D.      The Amendment and Switch to Washworld as Vendor**

13. After the EFA was signed, on or about February 28, 2024, Williams, on behalf of Debtor, orally represented to Pete Matheny, a Vice President of Ascentium, that AVW was unable to deliver the equipment purchased  by CWM in a timely fashion and that CWM had experienced other "red flags" regarding some business practices of AVW.  Accordingly, CWM was canceling

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

the purchase with AVW, obtaining a full refund of the Ascentium funding proceeds from AVW, and was purchasing the necessary equipment from Washworld.  This representation was confirmed in a February 28, 2024 email from Williams to Matheny, that was copied to Ortiz, and which transmitted what was represented to be a purchase quote from a different vendor-Washworld on a Washworld form, a true and correct copy of which is attached hereto as Exhibit 2 and incorporated herein by this reference ("the Quote").  The equipment set forth in the EFA and Quote is hereinafter referred to as "the Equipment." The money paid to AVM was refunded to Ascentium.

14.     Based on the representations of Williams, alleged above, on or about March 7, 2024, Ascentium prepared and sent to CWM and CWM, by Ortiz, executed and delivered to Ascentium an Addendum, Agreement No. 2763169 changing the amount financed from $343,394.23 to $346,904.75 and also changing the  payment schedule from 1 payment at $34,339.71, followed by 71 payments at $5,918.76, to 1 payment at $34,339.71 followed by 1 payment at  $5,987.29, followed by 70 payments at $5,987,29, a true and correct copy of which is attached hereto as Exhibit "3" and incorporated herein by this reference. On or about March 11, 2024, Ortiz verbally acknowledged to Ascentium and Ascentium documented that communication with Ortiz that the Equipment had been received by CWM.

**E.     The Relationship Between CWM and Washworld**

15.     Ascentium is informed and believes and therein alleges that, at the time of the February 28, 2024, email referred to in paragraph 12, CWM was an authorized distributor of Washworld products.  Prior to the CWM transaction in February, 2024, Ascentium had funded two unrelated loan transactions to different customers in the form of Equipment Finance Agreements involving the purchase of Washworld equipment where CWM had been the "primary vendor" to Ascentium's customer and approximately another 20 transactions where Washworld had been the "primary vendor" or one of its other distributors had been the "primary vendor." Ascentium is informed and believes and thereon alleges that at all times herein mentioned the relationship between CWM and Washworld was such that CWM was given access to and was authorized to issue quotes on Washworld forms, such as the quote Williams sent to Ascentium set

forth in paragraph 12. Further, the custom and practice between Ascentium and Washworld is that most of the time these Orders were not signed by Washworld.

**F.     The Washworld Funding Instructions**

16.     In connection with Ascentium's past dealings with Washworld, on or about February 28, 2023, Washworld, by its controller, Jon Tyezkowski, an authorized representative, executed and delivered to Ascentium written "Funding Instructions", a true and correct copy of which is attached hereto as Exhibit "4" and incorporated herein by this reference.  The Funding Instructions listed Washworld's email address as "controller@washworldinc.com" and provided, among other things:

> Payee [Washworld] agrees any funds received from Ascentium are for the sole purpose of advancing funds for Payee's customer to pay the purchase orders, invoices, quotes, or proposals for the application transaction.  If funds to which Payee is not entitled are deposited into Payee's account or otherwise received by Payee, Payee agrees to promptly remit any such funds to or as directed by Ascentium.

**G.     The Mistaken Payment**

17.     On March 12, 2024, Ascentium sent an email to ajohnson@washworldinc.com and controller@washworldinc.com transmitting a "Payment Notification" stating:

| | |
|---|---|
| Invoice # : | Car Wash Management, Inc. |
| Payment Type : | Equipment |
| Customer Name : | Car Wash Management, Inc. |
| Finance Agreement # : | 2763169 |
| Payment Method : | ACH |
| Date : | March 11, 2024 |
| Amount : | $309,054.80 |

Among other things, the Payment Notification stated:

> If you have questions about this payment, please contact your Vendor Services Representative, Maria Negri, at MariaNegri@ascentiumcapital.com or (281) 902-1938.

18.     Ascentium in fact sent payment by Automated Clearinghouse Debit ("ACH") to Washworld in the amount of $309,954.00 on March 11, 2024 (the "Mistaken Payment") for posting to the Washworld bank account listed in the Funding Instructions, and, on information and belief, same was posted and credited to such account on March 12, 2024. A true and correct copy of evidence of the Mistaken Payment is attached hereto, marked Exhibit "5" and incorporated

5852240v1 | 100287-0289

6

COMPLAINT

herein by this reference.

19.     Despite the fact that Washworld could not reconcile or match the funding it received from Ascentium to any Order it had issued (as opposed to all other previous customer orders that Ascentium had funded to Washworld which had a clear match to the Order total and amount funded, at no time did Washworld contact Maria Negri or anyone else at Ascentium regarding the receipt of this CWM payment or inquire why that payment was made or what Order it was for. At no time did Washworld reference the Finance Agreement # referred to above to contact Ascentium regarding receipt of the payment.

**H.     The Fraud**

20.     Ascentium is informed and believes and therein alleges that Washworld  alleges and contends that CWM ever sent the Quote or Order, Exhibit "2", to Washworld and never ordered, or intended to order, any of the equipment stated in the Quote identified in paragraph 12, Exhibit "2" from Washworld.

21.     Ascentium is informed and believes and therein alleges that when Washworld received the Mistaken Payment, it knew, had reason to know and/or should have known that there had been no order for equipment from CWM for either itself or a customer of CWM in the amount of the Mistaken Payment or in any amount even approaching the amount of the Mistaken Payment to which Ascentium was the lender.

22.     Instead of contacting Ascentium regarding the Mistaken Payment as stated in the Payment Notice and as required by the Funding Instructions, Ascentium is informed and believes and therein alleges that Washworld contacted CWM regarding the Mistaken Payment and was told by CWM that the payment should be applied to an order by one of its customers Conserv Fuels, located in Chula Vista, California, that had a remaining balance due of $132,509.09 on a prior CWM/Washworld Order unrelated to Ascentium and that Washworld applied a portion of the Mistaken Payment to pay that balance and sent a payment back to CWM in the amount of $176,552.71 on March 19, 2024. Ascentium is informed and believes and thereon alleges that Washworld contends that CWM sent the $176,552.71 back to CWM because Williams represented that this money was to buy additional equipment from another vendor or supplier and

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

5852240v1 | 100287-0289

7

COMPLAINT

not Washworld.  At no time did anyone at Washworld make inquiry of Ascentium regarding the reason for the Mistaken Payment, what equipment or purchase order or contract number it related to, or whether the amount or any of it should be returned to Ascentium despite the requirement to do so under the Funding Instructions.  Instead, Washworld concealed the true facts from Ascentium.

23.     On or about May 23, 2024, Pete Matheny of Ascentium sent to Washworld a copy of the Quote (Exhibit "2") on Washworld's form that had been received from Williams.  Washworld never responded in any fashion, did not inform Ascentium that such the Quote or any similar quote had been issued by or provided to Washworld and did not inform Ascentium of the facts alleged in paragraph 20 until on or about September 26, 2024, in response to further follow up from Pete Matheny.

24.     Once Ascentium became fully aware of the facts as it knows them now,  Ascentium i) declared the EFA in default and accelerated the entire balance of the loan by making demand for immediate payment of the entire loan balance upon CWM, WCCW and Ortiz via the Notice of Default and Acceleration letter ("Acceleration Letter"), and ii) contact Washworld in an attempt to obtain the return of the Mistaken Payment.

25.     CWM, WCCW and Ortiz failed and refused to pay the accelerated balance or to respond to the Acceleration Letter.

26.     Washworld failed and refused to respond to Ascentium's attempts to request return the Mistaken Payment and is informed and believes and thereon alleges that Washworld actually concealed the true facts regarding the additional $176,552.71 sent to CWM as set forth below.

## FIRST CAUSE OF ACTION

### (Against CWM for Breach of EFA)

27.     Ascentium incorporates herein by this reference, paragraphs 1-25, Inclusive, as though fully set forth at length.

28.     Ascentium has performed all terms, conditions, covenants, and promises on its part required to be performed in accordance with the terms of the EFA as amended and all other related documents and instruments executed in connection therewith.

Frandzel Robins Bloom & Csato, L.C.
1000 Wilshire Boulevard, Nineteenth Floor
Los Angeles, California 90017-2427
(323) 852-1000

5852240v1 | 100287-0289

8

29.     Debtor defaulted by breaching many of the covenants set forth in paragraphs 2, 6 and 10 of the EFA based on its conduct set forth above and also failed to make the payments due on the EFA from and after October, 2024.  Ascentium has elected to accelerate and declared the entire balance of the EFA immediately due and payable.  The accelerated amount due as of October 30, 2024, is as follows:

| | |
|---|---|
| Past Due Payments: | $17,478.45 |
| Late Charges: | 648.72 |
| Insurance Charges for insurance Debtor failed to obtain: | 499.94 |
| Future Payments Accelerated (3% value discount applied) | 393,891.05 |
| TOTAL | $350,997.00 |

Interest accrues on the amount due at the rate of $172.53 per day from and after October 30, 2024 until payment in full or date of entry of judgment.  On October 30, 2024, the Acceleration Letter was sent to Debtor and all guarantors (1) demanding payment of the amounts due and (2) possession of the Equipment.  Debtor and (as alleged below) all guarantors have failed and refused to pay the amounts due and owing as alleged herein and, on information and belief, there is no equipment to turn over to Ascentium. A true and correct copy of the Acceleration Letter is attached hereto, marked Exhibit "6" and is incorporated herein by this reference.

30.     Ascentium is informed and believes and therein alleges that none of the Equipment that was to be financed by the EFA was delivered to or received by the Debtor, which is another breach of the EFA and that the representation made by Ortiz that the Equipment had been received was false.

31.     Ascentium has not yet repossessed any Equipment nor will it likely be able to since the Equipment referred to in the Order probably did not exist and this Complaint is not for a deficiency.

32.     Pursuant to the EFA, Ascentium is entitled to recover its reasonable attorney fees and costs in enforcing its rights thereunder.  Ascentium has employed counsel and has incurred and will in the future incur reasonable attorneys fees and costs to be set by the Court according to proof.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

9

COMPLAINT

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

## SECOND CAUSE OF ACTION

### (For Breach of Guaranty against Defendant Ortiz)

33. Ascentium incorporates herein by this reference paragraphs 1-32, inclusive, as though fully set forth and length.

34. In connection with Debtor executing and delivering the EFA, Ortiz made, executed, and delivered to Ascentium his Personal Guaranty, Agreement No. 2763169, dated January 5, 2024 (the "Ortiz Guaranty") of the obligations of Debtor under the EFA, a true and correct copy of which is attached hereto as Exhibit "7" and incorporated herein by this reference.

35. Ascentium has performed all terms, conditions, covenants, and promises on its part required to be performed pursuant to the terms of the Ortiz Guaranty.

36. Demand has been made on Debtor and Ortiz to pay all sums due to Ascentium, but Debtor and Ortiz have failed to do so. As a result, Ascentium has declared the Ortiz Guaranty to be in default and has made demand on Ortiz to pay the full amount due pursuant to the terms of the EFA and the Ortiz Guaranty, but Ortiz has failed to do so.

37. As a result of the foregoing, Ascentium is entitled to recover all amounts alleged to be due under the EFA in paragraph 25 above in at least the sum of $350,997.00 plus interest, in an amount according to proof.

38. Pursuant to the Ortiz Guaranty, Ascentium is entitled to recover its expenses, including reasonable attorney's fees in enforcing the Ortiz Guaranty.

## THIRD CAUSE OF ACTION

### (For Breach of Guaranty against WCCW)

39. Ascentium incorporates herein by this reference paragraphs 1-39, Inclusive, as though fully set forth and length.

40. In connection with Debtor executing and delivering the EFA, WCCW made, executed, and delivered to Ascentium its Guaranty, Agreement No. 2763169, dated January 5, 2024 (the "WCCW Guaranty") of the obligations of Debtor under the EFA, a true and correct copy of which is attached hereto as Exhibit "8" and incorporated herein by this reference.

41. Ascentium has performed all terms, conditions, covenants, and promises on its part

required to be performed pursuant to the terms of the WCCW Guaranty.

42.     Demand has been made on Debtor and WCCW to pay all sums due to Ascentium, but Debtor and WCCW have failed to do so. As a result, Ascentium has declared the WCCW Guaranty to be in default and has made demand on WCCW to pay the full amount due pursuant to the terms of the EFA and the WCCW Guaranty, but WCCW has failed to do so.

43.     As a result of the foregoing, Ascentium is entitled to recover all amounts alleged to be due under the EFA in paragraph 25 above in at least the sum of $350,997.00 plus interest but in an amount according to proof.

44.     Pursuant to the WCCW Guaranty, Ascentium is entitled to recover its expenses, including reasonable attorneys' fees in enforcing the WCCW Guaranty.

**FOURTH CAUSE OF ACTION**

**(For Fraud/Concealment against CWM, Williams, and Ortiz and Does 1-10 Inclusive)**

45.     Ascentium incorporates herein by this reference paragraphs 1-44, inclusive, as though fully set forth and length.

46.     CWM, through Williams and Ortiz, represented to Ascentium that CWM intended to order the Equipment stated in the Quote, Exhibit 2 hereto, the purchase of which would be the subject of the EFA, as amended by Exhibit "3'.

47.     The representation was false when made; the true facts were that Williams and Ortiz never intended to cause CWM to order the Equipment listed in the Quote.

48.     In addition, and in connection with the fraud, Ortiz orally represented to Ascentium that the Equipment had been delivered when in fact it was never delivered to perpetuate and conceal the fraud.

49.     The representations were made with the intent to induce Ascentium to make the Mistaken Payment to Washworld, so that they could cause Washworld to apply a portion thereof to the outstanding invoice for another customer of CWM and to send the balance to CWM as working capital or for whatever other reason CWM needed the money for but nothing to do with the Equipment or the EFA. In addition, Plaintiff is informed and believes and thereon alleges that in order to conceal why the $176,552.71 was being remitted from Washworld to CWM, it was

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

5852240v1 | 100287-0289                                         11

COMPLAINT

structed by Washworld and the Defendants herein as a commission paid on the Conserv Fuels Order.

50.    In reliance on the representations, Ascentium made the Mistaken Payment to Washworld,  Ascentium's reliance was reasonable in view of (a) Ascentium's history in dealing with CWM and Washworld, (b) the history of the EFA transaction where CWM apparently ordered equipment from AVW which refunded the payment previously made by Ascentium to AVW, (c) CWM's status as a distributor of Washworld which, among other things, provided CWM with access to Washworld's order forms, (d) the apparent bonafides of the Quote, (e) CWM obligating itself under the EFA as amended to pay the amounts due thereunder, which was personally guaranteed by Ortiz and WCCW, (f) the contractual obligation of Washworld to contact Ascentium if there were any questions regarding payments and (g) the transaction was handled as prior transactions with Washworld sending the Payment Notification along with the $309,054.52 wired to Washworld; (h) that in most of the Washworld transactions the Order forms were not signed by Washworld and the custom and practice and course of dealing with Washworld in previous transactions was no different as in this transaction.

51.    Had Ascentium known the true facts, it never would have made the Mistaken Payment to Washworld or entered into the EFA.

52.    As a direct and proximate result of Ascentium's reliance on the fraudulent misrepresentations, Ascentium has been damaged in the amount of the Mistaken Payment plus interest thereon from and after the date of payment.

53.    The conduct of CWM, Williams, Ortiz, as its managing agents, was done with oppression, fraud and malice within the meaning of Civil Code § 3294.  As managing agents and officers and/or members Williams and Ortiz had the authority to act on behalf of CWM. Ascentium is therefore entitled to recover punitive and exemplary damages from each of such defendants in an amount according to proof.

### FIFTH CAUSE OF ACTION

**(Against Washworld for Recovery of Money Paid by Mistake)**

54.    Ascentium incorporates herein by this reference paragraphs 1-52, Inclusive, as

5852240v1 | 100287-0289

12

COMPLAINT

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

though fully set forth and length.

55.    As alleged herein, Ascentium was fraudulently induced to make the Mistaken Payment to Washworld.

56.    Upon receipt of the Mistaken Payment, Washworld knew, had reason to know, and/or should have known, the Payment was, in fact, mistaken and was not on account of any then-pending transaction, because of, among other things, the following:  (a) there was then pending no order from CWM with a payment due from CWM in the amount of the Mistaken Payment or in an amount even remotely similar to that amount, (b) the receipt of the Mistaken Payment in fact caused Washworld to question what it was for and to make inquiry of CWM as to what obligation it was related to, (c) instead of following the instructions in the Payment Notice to direct any questions regarding the payment referred to therein to Ascentium, Washworld made the conscious and intentional decision to not do so but to direct questions to CWM even though the Mistaken Payment was paid by Ascentium to Washworld, (d) instead of following the requirements of the Funding Instructions, Washworld made the conscious and intentional decision not to contact Ascentium regarding same; (e) in all its prior dealings on transactions funded by Ascentium, Washworld had never received a payment that it did not readily associate with a known pending transaction involving equipment that was being sold, (f) on information and belief, Washworld had never before received a payment on account by a purchase order for an Ascentium transaction or transaction involving CWM as the borrower, or relating to any other distributor as the borrower, or direct sale that was over double the amount owed on the transaction to which it was applied, (g) on information and belief, Washworld was not expecting a funding from Ascentium at the time in any amount let alone the amount of the Mistaken Payment, (h) on information and belief, Washworld knew that purchases of its products were funded by loans or leases that were intended to be secured by the equipment being purchased, thus sending more than 50% of the purported overpayment to the customer instead of the lender, could well be contrary to the contractual relationship between the customer and the lender, (i) on information and belief, Washworld had never before been confronted with a situation where it had received a payment from a vendor's financing source where the customer being financed requested that more than 50%

5852240v1 | 100287-0289

13

COMPLAINT

of the amount received be returned not to the funding source but to the intended obligor, (j) on information and belief, Washworld received no reasonably credible explanation from CWM as to why the amount of the Mistaken Payment was more than twice what was owed on the obligation of CWM's customer Conserv Fuels, to which the payment was applied or a credible explanation for the request that the overage be paid to CWM rather than returned to Ascentium and (k) the Mistaken Payment was larger than any prior payment received from Ascentium.

57.     Washworld retained the Mistaken Payment in bad faith and with reason to know that it was Mistaken and without complying with its obligation to make inquiry under the Funding Instructions and the request that was contained in the Payment Notice. Moreover, Plaintiff is informed and believes that the additional $176,552.71 remitted back to CWM and contrary to what the Funding Instructions required Washworld to do with the money and then accounted for this $176,552.71 as a commission paid by Washworld to CWM rather than what Washworld stated to Ascentium the reason was why this money was remitted back to CWM which was to buy ancillary equipment.

58.     By reason of the foregoing and by the conduct of Washworld in this transaction, in order to avoid an unjust enrichment of Washworld, Ascentium is entitled to restitution from Washworld of the entirety of the Mistaken Payment plus interest thereon from and after the date of the Mistaken Payment in an amount according to proof.

### SIXTH CAUSE OF ACTION

**(Against Washworld for Breach of Contract)**

59.     Ascentium incorporates herein by this reference paragraphs 1-58, inclusive, as though fully set forth and length.

60.     Pursuant to the Funding Instructions, Exhibit "4", Washworld was contractually obligated to remit the Mistaken Payment to Ascentium by reason of the fact that at the time of Washworld's receipt of same, there existed no valid purchase order, invoice, quote or proposal to which the Mistaken Payment related and thus same constituted funds to which Washworld, as payee, was not entitled, all as Washworld knew, had reason to know or should have known.

61.     Ascentium is informed and believes and therein alleges that when it received the

5852240v1 | 100287-0289

14

COMPLAINT

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

Mistaken Payment, Washworld employees in fact had questions as to why same had been received.  Instead of directing the questions to Ascentium, Washworld directed the questions to CWM,  and Williams, and/or possibly to Ortiz and, based on statements from these defendants, Washworld applied a portion of such funds to payment of an invoice it knew, had reason to know, or should have known, was not the intended subject of the Mistaken Payment and remitted the balance to CWM by and through Williams and/or Ortiz.

62.    To the extent there were conditions to be performed by Ascentium in connection with the Funding Instructions such conditions, covenants and promises were performed by Ascentium.

63.    As a direct and proximate result of Washworld's breach of the Funding Instructions, Ascentium has been damaged in the amount of the Mistaken Payment and is thus entitled to recover the full amount thereof from Washworld plus interest thereon from and after the date of the Mistaken Payment in an amount according to proof.

## SEVENTH CAUSE OF ACTION

### (For Money Had and Received Against Washworld)

64.    Ascentium incorporates herein by this reference paragraphs 1-58, inclusive, as though fully set forth and length.

65.    Within the two years last past, Washworld became indebted to Ascentium for money had and received for the use and benefit of Ascentium in the amount of the Mistaken Payment, no part of which has been paid. As a result, Ascentium is entitled to the amount of the Mistaken Payment together with interest thereon from and after the date of the Mistaken Payment in an amount according to proof.

## EIGHTH CAUSE OF ACTION

### (For Conversion as Against Washworld and Does 1-10)

66.    Plaintiff refers to paragraphs 1-52, and 54-58, Inclusive, by reference as if set forth in full.

67.    Plaintiff entered into the EFA with CWM which EFA was guaranteed by Ortiz and WCCW to make payments for the delivery of the Equipment which was collateral for the loan

5852240v1 | 100287-0289

15

COMPLAINT

evidenced by the EFA.

68. Washworld had executed the Funding Instructions with Ascentium so that in any transactions where it was the supplier of equipment, the loan proceeds for the borrower would be paid not to the borrower but to Washworld as the supplier in accordance with the terms of the Funding Instructions.

69. As stated above, in accordance with the EFA, the Commencement Agreement, the verbal verification that was done by Ortiz representing the Equipment was delivery and received and Ascentium was instructed to pay the $309,054.52 to Washworld.

70. Washworld was paid the $309,054.52 on or about March 12, 2024, and also received the Payment Notification setting forth why this sum was being paid to Washworld. At no time after the $309,054.52 was paid to Washworld was Ascentium contacted by Washworld as to why this payment was received from Ascentium. Instead, Washworld contends that it contacted Williams who instructed Washworld to apply the $132,509.09 to the Conserv Fuels alleged outstanding order and the $176,552.71 was remitted to CWM and never paid to Ascentium.

71. At all times herein mentioned Ascentium was not a volunteer in paying the $309,054.52 to Washworld or for the acquisition for the Equipment which never existed or was ordered.

72. Conversion is the wrongful act of dominion over the property of another. There does not have to be a wrongful intent but only that a defendant acted knowingly that it was not entitled to use or possession of property and any interference with the right to possession of another's property constitutes a conversion.

73. At the time that the $309,054.52 was wired to Washworld, and Washworld contended that it did not know why this money was sent to Washworld it contended that it did not know why it was sent by Ascentium even though it had the ability to contact Ascentium by and through Marie Negri or anyone else and also refer to the Finance Contract # on the Payment Notification. Moreover, Washworld had received many such Payment Notifications from Ascentium in the past and Ascentium is informed and believes and thereon alleges that it did not ever have any such issues with Washworld in the past. And the Funding Instructions specifically

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

state that the funds must be tied to a specific transaction or Order and the payment made by Washworld thereafter was not in accordance with the terms of the Funding Instructions.

74. Instead, the money was converted by Washworld by first paying on a different Order and it got the benefit of being paid on an Order that the money was not intended for. Second, Ascentium is informed and believes and thereon alleges that it used the $176,552.71 to pay a commission to CWM which was a further direct benefit to Washworld.

75. As a result of the conversion of the $309,054.52 Washworld converted this property which was not provided to Washworld for anything other than selling the Equipment to CWM with the loan proceeds furnished by Ascentium to Washworld and was used for Washworld's benefit. Therefore, Plaintiff is entitled to the sum of $309,054.52 together with interest thereon at the legal rate from and after March 12, 2024, in an amount according to proof.

WHEREFORE, Ascentium prays for judgment against Defendants, and each of them, as follows:

**On the First, Second and Third Causes of Action**

1. For the principal sum of $350,997.00 which also includes late charges;

2. For interest in the sum of $172.53 per day from and after October 30, 2024, until paid in full or date of entry of judgment;

3. For further late fees in an amount according to proof;

4. For reasonable attorneys fees in an amount according to proof;

**On the Fourth Cause of Action**

5. For damages in the amount of $309,054.52;

6. For interest at the legal rate from March 12, 2024 until date of entry of judgment in an amount according to proof;

7. For punitive and exemplary damages in an amount according to proof;

**On the Fifth Cause of Action**

8. For restitution in the amount of $309,054.52;

9. For interest at the legal rate on all damages according to proof;

**On the Sixth and Eighth Causes of Action**

10. For damages in the amount of $309.054.52;

11. For interest at the legal rate on all damages according to proof;

**On the Seventh Cause of Action**

12. For damages in the amount of $309.054.52;

13. For interest at the legal rate on all damages according to proof;

**On All Causes of Action**

14. For costs of suit incurred herein; and

15. For such other and further relief as the Court deems just and proper.

DATED:  February 20, 2026          FRANDZEL ROBINS BLOOM & CSATO, L.C.

By: _____
     ANDREW K. ALPER
     Attorneys for Plaintiff REGIONS BANK, an
     Alabama State Bank and as Successor by Merger
     to ASCENTIUM CAPITAL, LLC

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

# EXHIBIT 1

Case 2:25-cv-00359-AS-DS Document 46 Filed 02/23/26 Page 16 of 31 Page ID #:1561



**EQUIPMENT FINANCE AGREEMENT**
**Agreement No. 2763169**

Ascentium Capital
23970 HWY 59 N
Kingwood, TX 77339-1535
AscentiumCapital.com

| DEBTOR: | ADDRESS |
|---|---|
| CAR WASH MANAGEMENT, LLC | 310 S VINCENT AVE WEST COVINA CA 91790 |

| PAYMENT SCHEDULE: 1 @ $34,339.71, 71 @ $5,918.76 | FINANCED AMOUNT: $343,394.23 |
|---|---|

**INTEREST:** Payments include interest at **10.86%** per annum on the unpaid Financed Amount calculated based on a year consisting of 12 months of 30 days each.

**COLLATERAL:** Items of equipment, inventory and personal property related thereto as generally described herein which Regions Bank, an Alabama banking corporation d/b/a Ascentium Capital ("Secured Party") and Debtor agree that a more detailed description of the property being financed shall be maintained by us among our books and records in whatever more detailed description of the property financed is received from the supplier(s) of such property (the "Supplier") and, absent manifest error, such detailed description shall be considered incorporated into this Equipment Finance Agreement ("EFA") and shall be provided to Debtor promptly upon request.

**Personal Property Description:** CONVEYOR & EQUIPMENT FOR BAY

**1. Definitions:** The words "you" and "your" refer to the DEBTOR, its successors and permitted assigns, as shown above. The words "we", "us" and "our" refer to the SECURED PARTY, its successors and assigns.

**2. Funding; Representations & Warranties:** We agree to lend to you, and you agree to borrow from us, the Financed Amount set forth above for the financing of the Collateral and any shipping, installation, training, taxes, fees and other soft costs that we have approved for financing under this EFA (together, the "Soft Costs"). You irrevocably instruct us to pay the Supplier on your behalf, which payment is the funding of our loan to you. The Financed Amount is based upon the total estimated cost of the Collateral and financed Soft Costs (adjusted for any non-reimbursed down payments made by you) (the "Estimated Cost"), which Estimated Cost you and/or the Supplier have provided to us. If the final actual cost of the Collateral and any financed Soft Costs that we pay the Supplier and any taxing authority (the "Actual Cost") is different than the Estimated Cost, you authorize us to adjust the Financed Amount to the Actual Cost. If we request, you agree to execute a document reflecting such adjustments and we will provide you with evidence of our cost changes requiring such adjustments if you request. You represent and warrant to us that all information conveyed to us in connection with this EFA and all related documents whether by you, a guarantor, the Supplier or any other person, is true, accurate, complete and not misleading.

**3. Security Interest:** You hereby grant to us a security interest under the Uniform Commercial Code ("UCC") in the Collateral and all accessories and additions thereto and replacements thereof and all proceeds and products of the foregoing. Such security interest is granted to secure payment and performance by you of your obligations hereunder. All amounts received from you under this EFA shall be applied towards your obligations to us as we determine.

**4. Payments:** You agree to pay us: (a) the number of payments in the amount(s) shown above (each a "Payment") plus (b) a pro-rated payment equal to 1/30th of a standard Payment times the number of days from the funding date of the loan (the "Commencement Date") to the first monthly due date specified by us (the "First Due Date"). The interest rate stated above excludes this pro-rated payment and all fees. The pro-rated payment is due on the First Due Date, and the first Payment is due either in advance, on the First Due Date, or on the second Due Date, as specified by us. Subsequent Payments are due on the same day of each month thereafter (the period from the Commencement Date until full payment and performance of your obligations, the "Term"). You also agree to pay us all other amounts due from time to time hereunder. If your first Payment is due in advance and this contemplated transaction is not consummated, the total initial payment may be retained by us as partial compensation for costs and expenses incurred by us in preparation for the transaction. All payments are due whether or not we invoice you. You authorize us to adjust the Payment amount to maintain the same interest rate stated above if the Financed Amount changes. You may prepay this EFA only in accordance with the Prepayment Addendum referencing the Agreement No. above, which is made a part hereof . YOUR OBLIGATION TO MAKE PAYMENTS AND PAY OTHER AMOUNTS DUE HEREUNDER IS ABSOLUTE AND UNCONDITIONAL AND NOT SUBJECT TO ABATEMENT, REDUCTION OR SET-OFF FOR ANY REASON WHATSOEVER. THIS IS A NON-CANCELABLE AGREEMENT. THIS EFA, THE TERMS OF WHICH HAVE BEEN FREELY NEGOTIATED BY EACH PARTY, IS ALSO SUBJECT TO THE TERMS AND CONDITIONS ON THE FOLLOWING PAGE WHICH IS MADE PART HEREOF AND WHICH DEBTOR AND SECURED PARTY ACKNOWLEDGE THEY HAVE READ AND ACCEPTED.

**5. DISCLAIMER OF WARRANTIES AND CLAIMS; LIMITATION OF REMEDIES:** THERE ARE NO WARRANTIES BY OR ON BEHALF OF SECURED PARTY AND NEITHER THE SUPPLIER NOR ANY OTHER PARTY IS SECURED PARTY'S AGENT. DEBTOR ACKNOWLEDGES AND AGREES: (A) DEBTOR SELECTED THE SUPPLIER, THE COLLATERAL AND ANY SOFT COSTS, (B) SECURED PARTY MAKES NO WARRANTIES WHETHER EXPRESS OR IMPLIED AS TO THE CONDITION OF THE COLLATERAL, ITS MERCHANTABILITY, ITS FITNESS FOR ANY PARTICULAR PURPOSE; (C) DEBTOR ACCEPTS THE COLLATERAL "AS IS" AND WITH ALL FAULTS; (D) DEBTOR AGREES THAT THE COLLATERAL WILL BE USED SOLELY FOR COMMERCIAL OR BUSINESS PURPOSES; (E) IF THE COLLATERAL OR THE SOFT COSTS ARE UNSATISFACTORY FOR ANY REASON OR IF THE SUPPLIER FAILS TO DELIVER ALL OR ANY PART OF THE COLLATERAL OR SOFT COSTS TO DEBTOR, DEBTOR'S ONLY REMEDY, IF ANY, SHALL BE AGAINST THE SUPPLIER OR MANUFACTURER OF THE COLLATERAL AND SOFT COSTS AND NOT AGAINST SECURED PARTY; (F) DEBTOR SHALL HAVE NO REMEDY FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES AGAINST SECURED PARTY, ALL OF THE SAME BEING DISCLAIMED AND WAIVED; AND (G) NO DEFECT, DAMAGE OR UNFITNESS OF THE COLLATERAL OR SOFT COSTS NOR ANY FAILURE OF THE SUPPLIER TO DELIVER THE COLLATERAL OR SOFT COSTS TO DEBTOR SHALL RELIEVE DEBTOR OF THE OBLIGATION TO MAKE PAYMENTS OR RELIEVE DEBTOR OF ANY OTHER OBLIGATION UNDER THIS EFA.

**6. Location; Maintenance; Installation; Insurance:** You agree to maintain records showing the location of each item of Collateral. You shall report each location to us upon our request and shall not change the location of the Collateral without our advance written consent. You are responsible for installing and keeping the Collateral in good working order. You shall not make any alterations, additions or improvements to the Collateral which detracts from its economic value or functional utility. If the Collateral is damaged or lost, you agree to continue making scheduled Payments unless we have received the Casualty Value pursuant to Section 11. You agree to keep the Collateral insured against loss during the Term and to have us named as loss payee in such coverage amounts as we may specify from time to time, from an insurer who is acceptable to us. You agree to provide us with a certificate of insurance acceptable to us upon our request. If you do not provide such certificate then we will have the right, but not the obligation, to have such insurance placed for the Term in such form and amount as we deem reasonable to protect our interests. You understand and agree that (i) such insurance will name us, and not you, as the insured (therefore, such insurance will be for our sole benefit and not for your benefit) and (ii) your monthly payment pursuant to this EFA shall include a charge equal to (A) our premium expense for such insurance, which may be higher than the premium you would pay if you placed such insurance independently, plus (B) an annualized finance charge not to exceed 15% on our premium expense, plus (C) fees for billing and other administrative services with respect to such insurance in an amount not to exceed $7.00 per month.

**7. Taxes and Fees; Indemnification:** You agree to pay when due and to indemnify and hold us harmless from all taxes, fees, fines, interest and penalties, including, without limitation, personal property or documentary stamp taxes ("Taxes") relating to the use or ownership of the Collateral or to this EFA now or hereafter imposed, levied or assessed by any taxing authority. We may in our sole discretion, elect to pay any such Taxes directly to a taxing authority and if so you agree to reimburse us on our demand for any such Taxes paid on your behalf together with any filing or processing fee charged by us. If any taxing authority requires any Taxes to be paid in advance, and we pay such Taxes, we may increase the cost of the Collateral we are financing by such amount as described in Section 4 above thereby increasing the amount of each Payment to reflect the payment of such Taxes. You also agree to pay us and reimburse us for all costs and expenses in documenting and servicing this EFA. You agree to indemnify and hold us harmless from any suits, claims, losses or damages we suffer in any way relating to the use or ownership of the Collateral. Your obligations under this Section 7 shall survive the expiration or earlier termination of this EFA. You agree to pay us fees in an amount in effect from time to time in connection with the documentation of this EFA and any site inspection or lien search we deem necessary. You agree that all such fees, including fees and finance charges in connection with any insurance we obtain for our benefit pursuant to Section 6, may not only cover our costs they may also include a profit.

**8. Personal Property:** The Collateral will be and shall remain personal property and, if requested by us, you will obtain real property waivers satisfactory to us. You shall keep the Collateral free from any and all liens and encumbrances other than those in our favor. You shall give us immediate notice of any attachment or other judicial process, liens or encumbrances affecting the Collateral. You hereby irrevocably authorize us and appoint us as your attorney-in-fact with the power to execute and to file this EFA and any financing statement(s) or security agreement(s) with respect to the Collateral. If your signature on any financing statement or similar document is required by law, you shall execute such supplemental instruments and financing statements we deem to be necessary and advisable and shall otherwise cooperate to defend and perfect our interest in the Collateral by filing or otherwise. You also agree to pay us on demand filing and registration fees prescribed by the UCC or other law. Any Collateral that is subject to title or registration laws shall be titled and registered as directed by us.

**9. Default; Remedies; Late Charges:** If any one of the following events occur with respect to you or any Guarantor, you will be in default: (i) you fail to pay any Payment or other amount due under this EFA, when due, (ii) you breach or fail to perform any of your other covenants and promises under this EFA or any related document, (iii) you become insolvent, any action under the United States Bankruptcy Code is filed by or against you, make an assignment for the benefit of creditors, admit your inability to pay your debts as they become due, (iv) you merge, consolidate with, or sell all or substantially all of your assets or a majority of your ownership interests to any third party without our prior written consent or (v) if you terminate your entity existence or take any actions regarding the cessation or winding up of your business affairs. If you are in default, at our election, we can accelerate and require that you pay, as reasonable liquidated damages for loss of bargain, the "Accelerated Balance". The Accelerated Balance will be equal to the total of: (i) accrued and unpaid amounts then due under this EFA, and (ii) the remaining future Payments discounted to their then present value at 3% per annum. We can also direct Supplier to terminate your access to all software, services and support relating to the Collateral, without

liability to us or Supplier, and/or pursue any of the remedies available to us under the UCC or any other law. In the event we seek to take possession of any part of the Collateral, you irrevocably waive to the fullest extent permitted by law any bonds, surety or security required by statute, court rule or otherwise as an incident of such possession. You agree to pay our reasonable attorneys' fees and actual costs incurred by us in enforcing and defending our rights and interests hereunder including repossession, storage, refurbishment and sale of the Collateral and collection costs, and all non-sufficient funds charges and similar charges. If any part of a payment is late, you agree to pay us upon our demand the following, or if less, the maximum amount allowed under applicable law: (x) a late charge equal to 10% of the payment, (y) a charge of $30.00 for each check returned for any reason or if any ACH debit charge is not honored and (z) if we have had to perform collection activities in connection with such late payment, our specified collection charges then in effect. The foregoing will not be construed as interest but as reimbursement to us to cover administrative and overhead expenses related to the processing and collection of the late payment.

**10. Assignment; Inspection:** YOU HAVE NO RIGHT TO SELL, TRANSFER, ASSIGN, LEASE OR ENCUMBER THE COLLATERAL OR THIS EFA. We may sell, transfer, assign or encumber this EFA, in whole or in part, without notice to you or your consent. You agree that if we sell, transfer, assign or encumber this EFA, the assignee will have the rights and benefits that we assign to the assignee and will not have to perform any of our obligations. You agree that the rights of the assignee will not be subject to any claims, defenses or set-offs that you may have against us. We and our agents and representatives shall have the right at any time during regular business hours to inspect the Collateral and for that purpose to have access to the location of the Collateral.

**11. Risk of Loss:** You assume and shall bear the entire risk of loss, theft, damage and destruction of the Collateral from any cause whatsoever, and no loss, theft, damage or destruction of the Collateral shall relieve you of the obligation to make Payments or any other obligation under this EFA. You shall promptly notify us in writing of such loss, theft, damage or destruction. If damage of any kind occurs to any item of Collateral, you, at our option, shall at your expense (a) place the Collateral in good repair, condition or working order, or (b) if the Collateral cannot be repaired or is lost, stolen or suffers a constructive loss under an insurance policy covering the Collateral, pay to us the "Casualty Value." The Casualty Value will be equal to the total of (i) accrued and unpaid amounts then due and owing, and (ii) the remaining future Payments discounted to present value at 3%, in both cases as of the date the Casualty Value is received by us.

**12. Choice of Law; Waiver of Jury Trial:** Secured Party is an FDIC-insured institution with its main office in Alabama. This EFA is governed by applicable Federal Law and the laws of the State of Alabama with respect to interest and matters that are material to the determination of interest. This EFA is otherwise governed by the law of the State of Alabama, excluding conflicts of law principles. If any amount charged, collected or due exceeds the maximum amount permitted by applicable law, Secured Party shall make necessary adjustments to eliminate such excess. You consent to the non-exclusive jurisdiction of the courts located in Jefferson County, Alabama in any action or proceeding relating to this EFA, YOU WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH ACTION OR PROCEEDING, AND YOU WAIVE ANY RIGHT TO ASSERT THIS IS AN INCONVENIENT FORUM.

**13. Miscellaneous:** During the Term, you agree to provide us with all financial statements and copies of tax returns we may request. If we supply you with labels, you shall label any and all Collateral and shall keep the same affixed in a prominent place. If any provision hereof or any remedy herein provided is found to be invalid under any applicable law, the remaining provisions hereof, shall be given effect in accordance with the manifest intent hereof. The parties agree that each Payment includes interest. In some cases, we may receive a discount from Supplier to reduce your interest rate below what we would otherwise charge. Any such discount reduces your Payments due to a lower interest rate but does not reduce the Financed Amount. You agree that a waiver of breach will not be a waiver of any other subsequent breach, and that any delay or failure to enforce our rights under this EFA does not prevent us from enforcing any rights at a later time. YOU AGREE THAT WE WILL NOT BE LIABLE FOR ANY CONSEQUENTIAL OR INCIDENTAL DAMAGES FOR ANY DEFAULT BY US UNDER THIS EFA. Section headings are for convenience and are not a part of this EFA. You agree that by providing us with an email address or telephone number for a cellular or other wireless device, you expressly consent to receiving notices and other communications including email, voice and text messages from us or our affiliates or assigns at that email address or telephone number, and this express consent applies to each such email address or telephone number that you provide to us now or in the future and permits such communications regardless of their purpose. These calls and messages may incur access fees from your internet or wireless provider. You agree that the original of this EFA may be electronically duplicated and a copy hereof may be introduced in lieu of the original thereof and without further foundation. The parties hereto expressly waive the secondary evidence rule. You agree that this EFA will be binding upon your successors, permitted assigns, heirs and legal representatives. You authorize us to complete any blank in this instrument or in any document executed or delivered in connection herewith that contemplates a date by inserting a date deemed appropriate by us. Time is of the essence with respect to your obligations hereunder. Except as otherwise expressly permitted hereunder, no term or provision of this EFA may be amended, altered, waived or discharged except by a written instrument signed by the party against whom enforcement is sought. You agree, however, that we are authorized, without notice to you, to supply missing information or correct any misspellings or obvious errors in this EFA. Any formal notice given pursuant to this EFA shall, if delivered by mail, be deemed given 2 business days after being placed with the U.S. Postal Service, postage prepaid, addressed to the Debtor at its address set forth above, or to Secured Party at 23970 Hwy 59 N, Kingwood, TX 77339-1535, or such other address as a party may designate by written notice to the other. If Debtor constitutes more than one person, you agree that the liability of each such person hereunder is joint and several. Any restrictive endorsement on any check you give us in payment of any amount due hereunder shall be void. A facsimile or other copy of this EFA, as executed, shall be deemed the equivalent of the originally executed copy for all purposes. Secured Party may acknowledge acceptance of this EFA in a subsequent communication signed by Secured Party. All amounts payable hereunder by you if not paid when due shall accrue interest at a rate of interest of 1.5% per month or the highest rate allowed by applicable law if less, from the due date thereof until received by us in cash and shall be payable on demand. This EFA may be executed in separate counterparts which together shall constitute one and the same instrument. You agree this EFA may be signed electronically pursuant to the Electronic Signatures in Global and National Commerce Act and other applicable law. Only the copy of this EFA marked as the "sole original" or similar language by Secured Party or its designee is the chattel paper original of this EFA.

This EFA shall become effective upon Debtor's signature below, provided, however, that our obligation to perform our obligations under this EFA shall be subject to our satisfactory receipt of all conditions specified by us, including a complete and properly executed documentation package, as determined by us. By signing below, Debtor hereby irrevocably authorizes Secured Party to pay the Supplier on behalf of Debtor. The person executing this EFA is authorized to do so, making this EFA valid and binding on Debtor.

| Debtor Name: | CAR WASH MANAGEMENT, LLC | By: | ⊠ _(signature)_ |
| --- | --- | --- | --- |
| | | Printed Name/Title: | JOSE RENE ORTIZ, Member |

**AUTHORIZATION FOR ACH PAYMENTS:** Debtor authorizes Secured Party and Secured Party's successors and assigns to automatically initiate and make debit entry charges to Debtor's bank account indicated below for the payment of all amounts owed by you from time to time under the EFA. This Authorization is to remain in effect during the Term of the EFA and Debtor acknowledges that a revocation of this authority shall be an event of default under the Agreement. Any incorrect charge will be corrected upon notification to us, by either a credit or debit to Debtor's account.

| Bank Name: | Bank of America | Business Acct Name: | Car Wash Management LLC |
| --- | --- | --- | --- |
| Account No: | 325 1831 31 319 | ABA No.: | 121 000 358 |
| Authorized Signature: | ⊠ _(signature)_ | Printed Name and Title: | Jose Rene Ortiz / member |



**PREPAYMENT ADDENDUM**
Agreement No. 2763169
Customer: CAR WASH MANAGEMENT, LLC

Ascentium Capital
23970 HWY 59 N
Kingwood, TX 77339-1535
AscentiumCapital.com

This Prepayment Addendum ("Addendum") sets forth your right to prepay the transaction evidenced by the agreement identified above ("Agreement"). Capitalized terms used, but not defined, in this Addendum shall have the meaning set forth in the Agreement.

Provided no default under the Agreement has occurred and is continuing as of the Prepayment Date (as defined below), you may prepay the Agreement, in whole but not in part, on any business day by paying Ascentium the "Unpaid Balance" in immediately available funds.

The Unpaid Balance shall equal, as of the date of the receipt by Ascentium of the Unpaid Balance (such date, the "Prepayment Date"), the sum of (i) the Principal Balance plus (ii) the Prepayment Fee plus (iii) any Additional Amounts (each as defined below) due under the Agreement.

"Principal Balance" means:
(a) The sum of all unpaid Payments, less all unearned interest, that are due and to become due under the Agreement; plus
(b) Ascentium's unamortized initial direct costs for the transaction evidenced by the Agreement.

"Prepayment Fee" means:
(a) 5% of the Principal Balance if the Prepayment Date is on or before Ascentium's receipt of the 12th Payment, or
(b) 4% of the Principal Balance if the Prepayment Date is following Ascentium's receipt of the 12th Payment but on or before its receipt of the 24th Payment; or
(c) 3% of the Principal Balance if the Prepayment Date is following Ascentium's receipt of the 24th Payment but on or before its receipt of the 36th Payment; or
(d) 2% of the Principal Balance if the Prepayment Date is following Ascentium's receipt of the 36th Payment but on or before its receipt of the 48th Payment; or
(e) 1% of the Principal Balance if the Prepayment Date is following Ascentium's receipt of the 48th Payment.

"Additional Amounts" means (i) all other amounts (excluding Payments) due and owing under the Agreement as of the Prepayment Date, (ii) all known tax and insurance payments, if any, that we expect to pay on your behalf under the Agreement after the Prepayment Date but attributable to the period prior to the Prepayment Date, and (iii) all applicable taxes, if any, arising out of the prepayment.

Ascentium shall specify the Unpaid Balance which, absent manifest error, shall be binding and conclusive. Your prepayment pursuant to this Addendum does not release you from your indemnity obligations or your obligation to reimburse us for any taxes, insurance or other expenses we pay on your behalf under the Agreement after the Prepayment Date that were not included in the Unpaid Balance calculation. This Addendum is part of the Agreement. Except as expressly set forth in this Addendum, the Agreement remains unchanged and in full force and effect. You agree that a facsimile or other copy of this Addendum, as executed, shall be deemed the equivalent of an originally executed copy for all purposes.

Very truly yours,

*Regan S. White*

Regions Bank d/b/a Ascentium Capital

2916-20230804



**AUTHORIZATION TO PERFORM VERBAL VERIFICATION**
Agreement No. 2763169

Ascentium Capital
23970 HWY 59 N
Kingwood, TX 77339-1535
AscentiumCapital.com

The undersigned hereby authorizes Regions Bank, an Alabama banking corporation d/b/a Ascentium Capital ("Ascentium") to perform a verbal verification accepting the terms and conditions of the above-referenced Agreement and confirming the identification and condition of the Collateral or Equipment subject thereto.

The undersigned agrees that a facsimile or other image of this Authorization to Perform Verbal Verification, as executed, shall be deemed the equivalent of the originally executed copy for all purposes.

The undersigned understands and agrees that such verbal verification may be recorded and retained by Ascentium and hereby consents to such recordation and retention.

Person(s) Authorized to Provide Verbal Verification:

Name: _Jose R. Ortiz_ Title: _Member_ Phone: _1/8/2024_

Name: _____ Title: _____ Phone: _626-413-0842_

Name: _____ Title: _____ Phone _____

CUSTOMER: CAR WASH MANAGEMENT, LLC

Signature: _____

Printed Name: JOSE RENE ORTIZ

Title: Member   Date: _1/8/2024_

251-20230401



## COMMENCEMENT AGREEMENT
### Agreement No. 2763169

Ascentium Capital
23970 HWY 59 N
Kingwood, TX 77339-1535
AscentiumCapital.com

Date: January 5, 2024

You, the Customer, and Regions Bank d/b/a Ascentium Capital ("we", "us", "our") have entered into the above referenced equipment finance agreement, installment payment agreement, or similar agreement (which may be one or more schedules to a master agreement) (the "**Agreement**") pursuant to which we will be financing the Collateral or Software as defined in and described in the Agreement (in either case, the "**Collateral**"), subject to the terms and conditions set forth in the Agreement as supplemented by this Commencement Agreement ("**CA**"). Capitalized terms used herein and not defined herein have the meaning given such terms in the Agreement. The Collateral is being delivered to you at various times and the supplier(s) and vendor(s) (in either case, the "**Supplier**") of the Collateral have to be paid for each item of Collateral at or before its delivery to you. You agree that the Agreement is non-cancelable and in full force and effect (including, without limitation, with respect to your payment obligations thereunder) immediately even though items of Collateral remain to be delivered to you from one or more Suppliers.

**NOW THEREFORE, it is agreed as follows:**

1. Your obligations under the Agreement will commence on the date of this CA, including your obligation to pay 1/30 of a standard Payment from each day from and including the date hereof to but excluding the First Due Date. You acknowledge and agree that notwithstanding the fact that not all items of Collateral have been delivered to you as of the date set forth above, the terms and conditions of the Agreement, including your obligation to pay all amounts due and owing as set forth in the Agreement, shall commence immediately and, except as otherwise specifically set forth in this CA, irrevocably.

2. You agree to inspect all undelivered items of Collateral immediately upon their delivery to you. If, when delivered, an item of Collateral is damaged or non-conforming, you agree to cause the Supplier in question to repair and/or replace any such item of Collateral while continuing to meet all of your payment and other obligations under the Agreement and you agree that any replacement shall be part of the Collateral for all purposes under the Agreement.

3. All amounts anticipated to be disbursed by us on your behalf that have not been disbursed as of the date of this CA will be deemed disbursed by us into a separate holding account for your benefit ("Account"), the contents of which shall be debited by the amount of each subsequent disbursement to Supplier(s) as contemplated by this CA. To secure your obligations to us under the Agreement and this CA, you hereby grant to us a security interest in the contents of the Account and any proceeds.

4. You acknowledge that we may not have received a final invoice from the Supplier for all Collateral and Soft Costs financed under the Agreement. If the final actual cost of the Collateral and any financed Soft Costs that we pay the Supplier and any taxing authority (the "Actual Cost") is different than the Financed Amount set forth in the Agreement, you authorize us to adjust the Financed Amount to the Actual Cost. In addition, if we adjust the Financed Amount due to the Actual Cost changing from the Estimated Cost, you authorize us to adjust the Payment amount to maintain the same interest rate set forth in the Agreement. If we request, you agree to execute a document reflecting such adjustments and we will provide you with evidence of our cost changes requiring such adjustments if you request.

5. You agree that we will have no liability to you in the event we decide to terminate our purchase of any Collateral or payment for any Soft Costs from any Supplier because we have determined, in our sole discretion, that there has been a material adverse change in your creditworthiness from that on which we based our approval of the Agreement. In any circumstance contemplated by the preceding sentence, we will continue the Agreement based on the Financed Amount already paid by us to the Suppliers (and any taxing authority) as of the date we determine not to make further disbursements to the Suppliers and we will reduce the amount of each Payment you owe under the Agreement to reflect such actual Financed Amount and maintain the interest rate set forth in the Agreement, taking into account the higher Payments made by you up to the date of that determination and any balance in the Account shall revert to us.

6. This CA sets forth the entire agreement of the parties with respect to its subject matter and it may only be amended by a written instrument executed by the party against whom enforcement is sought. In the event of a conflict between this CA and the terms of the Agreement, the terms of this CA shall govern and control, provided however, except as explicitly set forth in Sections 4 and 5 above, nothing set forth in this CA shall be deemed to affect your obligation to pay and perform all of your obligations as set forth in the Agreement without setoff, abatement or counterclaim. This CA will be governed by and construed in accordance with the laws of the jurisdiction governing the Agreement.

You agree that a facsimile or other copy of this CA, as executed, shall be deemed the equivalent of the originally executed copy for all purposes. We may acknowledge acceptance of this CA by written notice to you of acceptance of the Agreement.

| Customer Name: | CAR WASH MANAGEMENT, LLC | By: | |
| --- | --- | --- | --- |
| | | Printed Name/Title: | JOSE RENE ORTIZ, Member |

301-20230508

# EXHIBIT 2

**From:** Andrew Williams <andrew@carwashmgmt.com>
**Sent:** Wednesday, February 28, 2024 10:49 AM
**To:** Pete M. Matheny <PeteMatheny@AscentiumCapital.com>
**Cc:** Rene Ortiz <rene@carwashmgmt.com>
**Subject:** [EXTERNAL] West Covina Car Wash

[External Content] Please use caution.

Hi Pete,

Attached is the quote for washworld.
The reason like we talked about over the phone is that they promised a quick turn around time and then turned out that it will be months. We could miss summer because of that. Also some of there business practices were red flags and could never get a hold of anyone over there when I needed to.

Let me know if you need anything else from us.

Regards,



ANDREW WILLIAMS
CHIEF EXECUTIVE OFFICER
(808) 465-2291
CARWASHMGMT.COM

Internal Use



(Effective: July 3, 2023)



| Sold To: | (Who will purchase from Washworld) |
|---|---|
| Company Name | West Covina Car Wash LLC |
| Contact | Andrew Williams |
| Address | 310 S Vincent Ave |
| City, State, Zip | West Covina, CA, 91790 |
| Office Phone | 8008-465-2291 |
| Mobile Phone | |
| Fax # | |

| Ship To: | (Physical Location Equipment will Ship to) |
|---|---|
| Company Name | West Covina Car Wash LLC |
| Contact | Andrew Williams |
| Address | 310 S Vincent Ave |
| City, State, Zip | West Covina, CA, 91790 |
| Office Phone | 8008-465-2291 |
| Mobile Phone | |
| Fax # | |

| Site Information: | (Physical Location Equipment will be Installed) |
|---|---|
| Company Name | West Covina Car Wash LLC |
| Contact | Andrew Williams |
| Address | 310 S Vincent Ave |
| City, State, Zip | West Covina, CA, 91790 |
| Office Phone | 8008-465-2291 |
| Mobile Phone | |
| Fax # | |

| Owner Information: | (Owner Contact for Warranty/Manual Purposes) |
|---|---|
| Company Name | |
| Contact | |
| Address | |
| City, State, Zip | |
| Office Phone | |
| Mobile Phone | |
| Fax # | |
| Email Address | |

Email Order to: sales@washworldinc.com

Fax Order to: (920) 338-9790

| Requested Ship Week of: | | |
|---|---|---|
| Month | Day | Year |
| | | |

*NOTE: This is NOT A Guaranteed Date*

| Order Details: | |
|---|---|
| Site Voltage | 208 |
| Wash Bay Inside Width | |
| Dryer Inside Width | |
| Dryer Voltage | |

**Note:** When ordering additional Razors for a site with existing Washworld equipment utilizing "Washworld HS Mobile". You must include the Serial number(s) for existing machines =

| Distributor Notes |
|---|
| One year warranty parts and labor |

RAZOR® · WASHWORLD · RAZOR® ON-BOARD DRYING SYSTEM

## STANDARD RAZOR SYSTEM INCLUDES:

**In-Bay Wall Mount System - Stainless Steel**
- Stainless steel travel rails (27' 4" overall length)
- Stainless steel wall mounting hardware
- Floor mounted blue reflectors for visual guidance
- Wash bay stop / backup loading eye wall mounting kit - Standard bays

**Overhead Carriage and Trolley Frame - Laser Cut Stainless Steel**
- Variable frequency controlled belt drive carriage and trolley movement
- Stainless steel contouring spray arch with variable frequency control
- VS² ® (Vehicle Sizing System)
- Virtual Attendant® - Maneuvers around wide mirrors and trailer hitches
- Visorclean - Nozzles strategically placed to clean under rear visor
- Spray arch cover - Rotationally molded polyethylene composite material
- Replaceable nozzle protector - Cross linked polyethylene foam
- Stainless steel carriage, totally enclosed climate proof motors and gearboxes with precise movement and minimal rolling resistance
- Energy chain - No festoon, overhead cross brace or overhead swivel
- Flex Pass® carriage manifold
- Triple pass technology for optimal front and rear cleaning
- Bug A'Salt™ technology for additional seasonal cleaning
- Arch mirror detailing - Arch will turn to clean and rinse side mirrors
- Attention grabbing blue LED highlighting the Razor® entrance cover

**Solution Delivery System - Powder Coated Carbon Steel Pump Station**
- Cat 3535 Pump / 25 HP premium high efficiency ODP motor
- Variable flow and pressure with water conservation system
- High flow multiple stage solution delivery pump system
- Composite direct injection / No drift chemical metering system
- Electronic air regulator - Allows for each foaming application to have its own pre-set air pressure
- 3 Separate pre-soak applications
- 2 High pressure sealant / Drying agent applications
- 1 Low pressure drying agent / Protectant application
- Dual inlet low pressure source selection (hot and cold)

**Ultimate Control Cabinet**
- Electrical control panel 208VAC (soft start and stop variable frequency motor controls on carriage, trolley and arch)
- Washview® On-Site control interface (complete programming flexibility)
- Complete on-site programming and diagnostic capability
- Wash activation buy-up compatibility
- Comprehensive integrated security system
- In-bay voice module to communicate Razor® actions to customer
- Waterproof hand held RF remote control for manual movement and machine function
- Auto home feature

| Razor Wash System | Qty | WW Part # | Unit Price | Totals |
|---|---|---|---|---|
| Washworld Razor Touch Free Wash System | 1 | 50000001 | $ 101,635.00 | $ 101,635.00 |
| Washworld Razor  W/ On-Board Dryer (Select Dryer & Starters Below) | 0 | 50000002 | $ 107,835.00 | $ - |
| Washworld Razor W/ In-Bay Pump Station | 0 | 50000003 | $ 110,440.00 | $ - |
| Washworld Razor W/ In-Bay Pump Station & On-board Dryer (Select Dryer & Starters Below) | 0 | 50000004 | $ 116,575.00 | $ - |
| **Razor UCC Cabinet Supply Voltage (Select One Option)** | | | | |
| 208 VAC 3 Phase 60 Hz Incoming Power Supply | 1 | 50040001 | Included | |
| 240 VAC 3 Phase 60 Hz Incoming Power Supply | 0 | 50040001 & WW6350 | $ 505.00 | $ - |
| 380/415 VAC 3 Phase 50 Hz Incoming Power Supply | 0 | 50040002 | Included | |
| **Pump Station Voltage Option (Select One Option)** | | | | |
| 208 VAC 3 Phase 60 Hz Incoming Power Supply | 0 | 50030001 | Included | |
| 480 VAC 3 Phase 60 Hz Incoming Power Supply | 0 | 50030002 | Included | |
| 575 VAC 3 Phase 60 Hz Incoming Power Supply | 0 | 50030003 | Included | |
| 380/415 VAC 3 Phase 50 Hz Incoming Power Supply | 0 | 50030004 | Included | |
| **Razor Wash System Options** | Qty | WW Part # | Unit Price | Totals |

| Razor Pump Option (Select One) | Qty | WW Part # | Unit Price | Totals |
|---|---|---|---|---|
| Cat 3535 High Pressure Pump | 1 | | Included | |
| General Pump - Emperor HTCK40 High Pressure Pump | 0 | | $ (1,585.00) | $ - |
| **Razor Drive Motor Option** | | | | |
| Razor Stainless Steel Motor Upgrade (Spray Arch, Trolley & Carriage) | 0 | 50400009 | $ 5,275.00 | $ - |
| Razor On-Board Dryer Stainless Steel Motor Upgrade (Spray Arch, Trolley & Carriage) | 0 | 50400010 | $ 5,675.00 | $ - |
| **Razor E-Chain Supply Options (Choose One)** | | | | |
| E-Chain Supply Passenger Side / Right Side while entering wash bay | 1 | 50700001 | Included | |
| E-Chain Supply Driver Side / Left Side while entering wash bay | 0 | 50700002 | Included | |
| **Wall Mount Options (Choose One)** | | | | |
| SS Wall Mount for Bays 13'-4" to 14'-0" | 0 | WW 6720 | Included | |
| SS Wall Mount for Bays 14'-0" to 16'-0" | 1 | WW 6730 | Included | |
| SS Wall Mount for Bays 16'-0" to 16'-9" | 0 | WW 6740 | $ 400.00 | $ - |
| SS Wall Mount for Bays 16'-9" to 18'-0" | 0 | WW 6750 | $ 770.00 | $ - |
| SS Wall Mount for On-Board Dryer: Bays 13'-4" to 14'-0" | 0 | WW 6722 | Included w/OBD | |
| SS Wall Mount for On-Board Dryer: Bays 14'-0" to 16'-0" | 0 | WW 6732 | Included w/OBD | |
| SS Wall Mount for On-Board Dryer: Bays 16'-0" to 16'-9" | 0 | WW 6742 | $ 995.00 | $ - |
| SS Wall Mount for On-Board Dryer: Bays 16'-9" to 18'-0" | 0 | WW 6752 | $ 1,495.00 | $ - |
| Free Standing Frame - Painted | 0 | WW 6000-FSF | $ 5,660.00 | $ - |
| Free Standing Frame - Stainless Steel | 0 | WW 6000-FSF-SS | $ 13,540.00 | $ - |
| Free Standing Frame On-Board Dryer - Painted | 0 | WW 6002-FSF | $ 8,400.00 | $ - |
| Free Standing Frame On-Board Dryer - Stainless Steel | 0 | WW 6002-FSF-SS | $ 19,995.00 | $ - |
| **Washbay VS2 Sensor Mounting Options (Choose One)** | | | | |
| Washbay Stop/Backup Loading Eye Wall Mounting Kit-For Standard Bays | 1 | WW 6420 | Included | |
| Washbay Stop/Backup Loading Eye Pedestal Mounting Kit-Free Standing Frame or Non-Standard Bays | 0 | WW 6430 | $ 480.00 | $ - |
| **SS Rail Options (Choose One)** | | | | |
| Stainless Steel 25' Rails (Actual Rail Length 25'-4") | 0 | WW 6400 | Included | |
| Stainless Steel 27' Rails (Actual Rail Length 27'-4") | 1 | WW 6402 | Included | |
| Stainless Steel 30' Rails - For On-Board Dryer Only (Actual Rail Length 30'-4") | 0 | WW 6404 | Included w/OBD | |
| | | **Sub Total - Wash Equipment** | | $ 101,635.00 |

| Razor Edge Package | Qty | WW Part # | Unit Price | Totals |
|---|---|---|---|---|
| Razor Edge Package, includes; **SpectraRay & HyperFlex** (requires 50120011 or 50120042) | 1 | 50120006 | $ 9,305.00 | $ 9,305.00 |
| **Arch Cover** | | | | |
| Standard Spray Arch | 1 | 50360002 | Included | |
| **Hyperflex Options** | | | | |
| HyperFlex, Up to 4 Programmable functions to Heighten the Wash Experience (requires 50120011 or 50120042) | 0 | 50120015 | $ 6,250.00 | $ - |
| HyperFlex Cold Climate Blow Down (requires 50120020, 50120021, 50120022 or 50120025) | 0 | 50120028 | $ 440.00 | $ - |
| **SpectraRay & SpectraRay⁺** | | | | |
| SpectraRay, Spectacular Array of 4,528 LED Lights in Red, Magenta, Blue & Green colors - **Machine Mounted** | 0 | 50120005 | $ 3,595.00 | $ - |
| **SpectraRay⁺** Spectacular Array of 5,568 - **Wall Mounted** LED Bay Lights in Red, Magenta, Blue and Green colors | 0 | 50380001 | $ 6,250.00 | $ - |
| **SpectraRay⁺** Optional On-Board Dryer FSF Mount Kit (Order w/ 50380001) | 0 | 50380002 | $ 2,225.00 | $ - |
| **SpectraRay⁺** Optional Pedestal Mount Kit (Order w/ 50380001) | 0 | 50380003 | $ 2,225.00 | $ - |
| **Razor Wash System Options (continued)** | **Qty** | **WW Part #** | **Unit Price** | **Totals** |

| Carriage Cover, Custom Decals | | | | |
|---|---|---|---|---|
| Standard Razor, Cover Decals, (Front and Back) | 0 | 50770001 | Included | |
| Razor EDGE Cover Decals (Front and Back) | 0 | 50770002 | Included | |
| Custom Carriage Graphics, Front & Back Covers (Final Approval needed 3 weeks prior to Ship Date) | 0 | 50770004 | $ 700.00 | $ - |
| **Under Carriage** (If Machine Cold Climate is Selected, It Must Match Selection Here) | | | | |
| Under Carriage Control System (Inc. Valving, Solenoid and Photoeyes)-Required For Use Of An Existing U/C | 0 | 50130005 | $ 2,000.00 | $ - |
| Under Carriage W/Rocker Blaster, w/3 Nozzle UC & 4 Nozzles on each Rocker Blaster (Inc. Valving, Solenoid & Photoeyes) | 0 | 50170006 | $ 2,895.00 | $ - |
| Under Carriage W/Power Tower Wheel Cleaner, 4 Rotating Nozzles per Tower (Non-Illuminated Covers)-Inc. Valving, Solenoid and Photoeyes | 0 | 50170007 | $ 5,450.00 | $ - |
| Under Carriage W/Power Tower Wheel Cleaner, 4 Rotating Nozzles per Tower (Illuminated Covers)-Inc. Valving, Solenoid and Photoeyes | 1 | 50170008 | $ 5,750.00 | $ 5,750.00 |
| Under Carriage Cold Climate (Heat and Weep) | 0 | 50130007 | $ 275.00 | $ - |
| Under Carriage Cold Climate (Heat and Blowdown) | 0 | 50130016 | $ 685.00 | $ - |
| **Big Shot Chemical Tire Application Options** | | | | |
| Big Shot CTA Simultaneous Application of Low & High PH Chemicals to Wheels | 0 | 50170004 | $ 4,195.00 | $ - |
| Big Shot CTA W/ Cold Climate Protection Heat (Heat for Photo Eyes only) | 0 | 50170005 | $ 4,270.00 | $ - |
| Big Shot CTA W/ Cold Climate Protection Heat/Blow-Down (Heat for Photo Eyes and Blow-Down for Fluid Lines) | 0 | 50170015 | $ 4,620.00 | $ - |
| **Tri Color Foam System Options** | | | | |
| Tri Color Foam System (W/O Cold Climate Protection) | 1 | 50120012 | $ 4,295.00 | $ 4,295.00 |
| Tri Color Foam System W/ Cold Climate Protection "Heated Pods and Weep" (Requires 50120020, 50120021, 50120022 or 50120025) | 0 | 50120023 | $ 5,650.00 | $ - |
| Tri Color Foam System W/ Cold Climate Protection "Heated Pods and Blow Down" (Requires 50120020, 50120021, 50120022 or 50120025) | 0 | 50120026 | $ 5,650.00 | $ - |
| **Foam N Flow Options** | | | | |
| Foam N Flow (Requires 50120011 or 50120042) | 0 | 50120013 | $ 3,865.00 | $ - |
| Foam N Flow Blow Down Option (Requires 50120020, 50120021, 50120022 or 50120025) | 0 | 50120027 | $ 275.00 | $ - |
| **Spot Free Delivery Options** (Choose One if Spot Free is Required) | | | | |
| 60 Hz Medium Pressure RO Pump (13 GPM @ 110 psi) Includes Wall Mount Bracket and Motor Starter | 1 | 50120011 | $ 1,995.00 | $ 1,995.00 |
| 50 Hz Medium Pressure RO Pump (13 GPM @ 110 psi) Includes Wall Mount Bracket and Motor Starter | 0 | 50120041 | $ 2,435.00 | $ - |
| | 0 | | $ - | $ - |
| **Razor Cold Climate Options** (If U/C Cold Climate Is Selected, It Must Match Selection Here) | | | | |
| Cold Climate Package (Heat for VS2 Sensors, Carriage & Rail Travel Surfaces, Belt Drive System, Weep for Spray Arch and FlexPass) | 0 | 50120020 | $ 3,495.00 | $ - |
| Cold Climate Package (Heat for VS2 Sensors, Carriage and Rail Travel Surfaces, Belt Drive System, Blow Down for Spray Arch and FlexPass | 0 | 50120025 | $ 3,695.00 | $ - |
| Cold Climate Package (Heat Only, for VS2 Sensors, Carriage & Rail Travel Surfaces, & Belt Drive System) | 0 | 50120021 | $ 2,795.00 | $ - |
| Cold Climate Package (Weep Only, for Spray Arch and FlexPass) | 0 | 50120022 | $ 1,165.00 | $ - |
| Cold Climate Package (Blow Down Only, for Spray Arch and FlexPass) | 0 | 50120029 | $ 1,865.00 | $ - |
| **High Speed DSL or Cable Internet Options** | | | | |
| Washview HMI Remote Primary - High Speed DSL or Cable Internet Connection Capability, Includes Wireless Router and HMI Software. NOTE: Smart Phone/Tablet Connection Requires Vijeo Design'Air App Purchase (Not Included) | 1 | 50120001 | $ 1,325.00 | $ 1,325.00 |

| | Qty | WW Part # | Unit Price | | Totals | |
|---|---|---|---|---|---|---|
| Washview HMI Remote Secondary - Additional High Speed DSL or Cable Internet Connection capability at same Location for Multi-Bay Sites.  NOTE: Requires Purchase of Washview HMI Remote Primary | 0 | 50120002 | $ | 785.00 | $ | - |

| Razor Wash System Options (continued) | Qty | WW Part # | Unit Price | | Totals | |
|---|---|---|---|---|---|---|
| **Chem Alert Options** | | | | | | |
| Chem Alert-Primary, Chemical Monitoring System (Software and 4 Chemical Sensors) Requires 50120001 or 50120002) | 0 | 50250001 | $ | 1,595.00 | $ | - |
| Chem Alert-Secondary, Additional Chemical Monitoring (Includes 4 Additional Chemical Sensors) | 0 | 50250002 | $ | 595.00 | $ | - |
| **Razor Reclaim Option** | | | | | | |
| Reclaim Adapter (Plumbing Inlet and Controls for External Reclaim System) | 0 | 50120010 | $ | 1,195.00 | $ | - |
| **Door Control Options** | | | | | | |
| Premium Door Controls | 0 | WW 6020 | $ | 1,995.00 | $ | - |
| Ultimate Door Controls-Eyes (Features Above-Ground Eyes for Existing Sites) | 0 | WW 6022 | $ | 3,195.00 | $ | - |
| **Misc. Options** (Poly Tubing and Connector Coupling Pricing Subject to Current Parts Pricing) | | | | | | |
| Custom Voice Option for In-Bay Voice Module - Note: See Custom Voice Requirements. | 0 | WW 6005-CV | $ | 625.00 | $ | - |
| 5HP Compressor fully loaded | 1 | Compressor | $ | 5,200.00 | $ | 5,200.00 |
| Dual Port Injector System / To replace Single Injector for Low Pressure Application / Order per Injector | 0 | WW 005 | $ | 55.00 | $ | - |
| 3/4" OD, Blue Poly Tubing, 100' Roll, (for plumbing the HyperFlex from Pump Stand to E-chain) | 1 | 41570003 | $ | 468.75 | $ | 468.75 |
| 3/4" OD, Blue Poly Tubing, 250' Roll, (for plumbing the HyperFlex from Pump Stand to E-chain) | 0 | 41570004 | $ | 1,171.50 | $ | - |
| 3/4" Connector Coupling, Straight, Plastic | 6 | 41410001 | $ | 14.00 | $ | 84.00 |
| Razor Customer Spare Parts Kit (rev4) | 0 | 50310001 | $ | 5,095.00 | $ | - |
| | | | **Sub Total - Wash Options** | | $ | 28,422.75 |

| Signage (Extra Service & Directional) | Qty | WW Part # | Unit Price | | Totals | |
|---|---|---|---|---|---|---|
| **Signage-(12V) LED Instructional  "Entrance and In Bay Signs are Required to Operate"** | | | | | | |
| Entrance Stop/Drive Forward Sign | 0 | WW 20030-12V | $ | 1,275.00 | $ | - |
| Entrance Stop/Drive Forward / Wash Progress | 0 | WW 20030-12VWP | $ | 1,550.00 | $ | - |
| In Bay 3-Panel Stop/Drive Forward / Back-Up Sign | 0 | WW 20008-12V3P | $ | 1,475.00 | $ | - |
| Entrance Stop/Drive Forward Sign (Custom Verbiage / Graphics) | 0 | WW 20030-12VC | $ | 1,495.00 | $ | - |
| Entrance Stop/Drive Forward / Wash Progress (Custom Verbiage / Graphics) | 0 | WW 20030-12VWPC | $ | 1,770.00 | $ | - |
| In-Bay 3 Panel Stop/Drive Forward/Back-Up Sign (Custom Verbiage / Graphics) | 0 | WW 20008-12V3PC | $ | 1,695.00 | $ | - |
| In Bay 8-Panel Directional Sign | 0 | WW 20008-12V | $ | 2,150.00 | $ | - |
| In Bay 8-Panel Directional Sign W/ Triple Foam | 0 | WW 20008-12VTF | $ | 2,150.00 | $ | - |
| In Bay 8-Panel Directional Sign  (Custom Verbiage / Graphics) | 0 | WW 20008-12VC | $ | 2,370.00 | $ | - |
| Sign Package, Entrance Stop/Drive Forward and Inbay 8-Panel Directional (Standard) | 0 | WW 20007-12V | $ | 3,395.00 | $ | - |
| Sign Package, Entrance Stop/Drive Forward and Inbay 8-Panel Directional (W/ Triple Foam) | 1 | WW 20007-12VTF | $ | 3,395.00 | $ | 3,395.00 |
| Sign Package, Entrance Stop/Drive Forward and Inbay 8-Panel Directional (Custom Verbiage / Graphics) | 0 | WW 20007-12VC | $ | 3,595.00 | $ | - |
| Sign Package, Entrance Stop/Drive Forward / Wash Progress and Inbay 8-Panel Directional (Standard) | 0 | WW 20007-12VWP | $ | 3,670.00 | $ | - |
| Sign Package, Entrance Stop/Drive Forward / Wash Progress and Inbay 8-Panel Directional (W/ Triple Foam) | 0 | WW 20007-12VTFWP | $ | 3,670.00 | $ | - |
| Sign Package, Entrance Stop/Drive Forward / Wash Progress and Inbay 8-Panel Directional (Custom Verbiage / Graphics) | 0 | WW 20007-12VWPC | $ | 3,870.00 | $ | - |
| NEW Dryer Cover W/LED Wash Instruction Signage is Available Below In the Dryer Cover Option Section | | | | | | |
| NEW Car Wash OPEN/CLOSED Sign (Changes Status based on Wash Ready/Out of Service) | 0 | 50370012 | $ | 915.00 | $ | - |

| Signage-(24V) LED Instructional | Qty | WW Part # | Unit Price | | Totals | |
|---|---|---|---|---|---|---|
| Entrance Stop/Drive Forward Sign (Entirely LED) * | 0 | WW 20030-LED | $ | 1,775.00 | $ | - |
| In Bay 8-Panel Directional Sign (Entirely LED) * | 0 | WW 20008-LED | $ | 3,975.00 | $ | - |

| In Bay 8-Panel Directional Sign W/ | | | | $ 3,975.00 | $ - |
|---|---|---|---|---|---|
| **Signage (Extra Service & Directional) - Continued** | **Qty** | **WW Part #** | **Unit Price** | | **Totals** |
| **Signage-(24V) Dryer Countdown Timers** | | | | | |
| LED Count Down Timer With Wall Mount System, 30" Wall Brackets, Fiberglass Cover | 0 | WW 20012-LED-WM | $ 1,975.00 | $ - | |
| LED Count Down Timer With Stand, Fiberglass Cover | 0 | WW 20012-LED | $ 2,185.00 | $ - | |
| LED Count Down Timer With Wall Mount System, 30" Wall Brackets, Blue Face, Stainless Steel | 0 | WW 20014-WM | $ 1,485.00 | $ - | |
| LED Count Down Timer With Stand, Blue Face, Stainless Steel | 1 | WW 20014 | $ 1,695.00 | $ 1,695.00 | |
| LED Count Down Timer With Wall Mount System, 30" Wall Brackets, Custom Graphics, Stainless Steel | 0 | 50370002 | $ 1,685.00 | $ - | |
| LED Count Down Timer With Stand, Custom Graphics, Stainless Steel | 0 | 50370001 | $ 1,895.00 | $ - | |
| **Signage - Clearance - Guidance** | | | | | |
| Hanging Clearance Sign - 7' (5' Long Round PVC) Includes SS Cable and Mounting Hardware | 0 | WW 057 | $ 365.00 | $ - | |
| Hanging Clearance Sign - Custom (5' Long Round PVC) Includes SS Cable and Mounting Hardware | 0 | WW 057-C | $ 435.00 | $ - | |
| Hanging Lighted Clearance Sign - 7' - Includes SS Cable and Mounting Hardware | 0 | WW 060 | $ 775.00 | $ - | |
| Ground Mount Clearance Stand - 7' - (White Powder Coated), Includes Clearance Sign | 1 | WW 20000-RED | $ 1,715.00 | $ 1,715.00 | |
| Ground Mount Clearance Stand (White Powder Coated), Includes Custom Clearance Sign | 0 | WW 20000-C | $ 1,785.00 | $ - | |
| Ground Mount Clearance Stand - 7' - (White Powder Coated), Includes **Lighted** Clearance Sign | 0 | WW 060-S | $ 2,195.00 | $ - | |
| Wash Bay LED Guide Lighting (Floor Mounted Pair) | 0 | WW 20047-LED | $ 1,490.00 | $ - | |
| **Additional** Washbay Reflector Kit-**BLUE** (Includes: (24) 2-Sided Reflectors, Adhesive and Applicator) | 0 | WW 20046 | $ 340.00 | $ - | |
| | | **Sub Total - Signage** | | $ 6,805.00 | |

| **High Velocity Drying Equipment-Custom Dryer Configurations** (See Washworld High Velocity Dryer Price List) | | **Qty** | **WW Part #** | **Unit Price** | **Totals** |
|---|---|---|---|---|---|
| **High Velocity Stand Alone and OBD Dryers (All Require Dryer Motor Control Center)** | | | | | |
| 50 HP with All Stationary Nozzles | (5) 10 HP Motors | 1 | WW 20074-5 | $ 18,640.00 | $ 18,640.00 |
| 1 HP **(On-Board System)** | (1) 10 HP Motors | 1 | WW 10FIX | $ 3,730.00 | $ 3,730.00 |
| 30 HP with All Stationary Nozzles | (4) 7.5 HP Motors | 0 | WW 20069-7.5 | $ 14,910.00 | $ - |
| 30 HP **(On-Board System)** | (4) 7.5 HP Motors | 0 | WW 20081-7.5 | $ 20,550.00 | $ - |
| 45 HP with All Stationary Nozzles | (3) 15 HP Motors | 0 | WW 20071 | $ 11,430.00 | $ - |
| 45 HP **(On-Board System)** | (3) 15 HP Motors | 0 | WW 20083 | $ 18,000.00 | $ - |
| 40 HP with All Stationary Nozzles | (4) 10 HP Motors | 0 | WW 20073 | $ 14,910.00 | $ - |
| 40 HP **(On-Board System)** | (4) 10 HP Motors | 0 | WW 20082 | $ 20,550.00 | $ - |
| 50 HP with All Stationary Nozzles | (2) 10 HP Motors & (2) 15 HP Motors | 0 | WW 20074 | $ 15,075.00 | $ - |

| **High Velocity Dryer Mounting Options** | | **Qty** | **WW Part #** | **Unit Price** | **Totals** |
|---|---|---|---|---|---|
| Interior Dryer Wall Mount Kit, 13' 4" to 18' | | 0 | 50190001 | $ 1,630.00 | $ - |
| Exterior Dryer Wall Mount Kit | | 0 | 50190003 | $ 1,630.00 | $ - |
| Free Standing Arch Dryer Mount Kit Sainless Steel | | 1 | 50190002 | $ 2,995.00 | $ 2,995.00 |

| **High Velocity Dryer Motor Control Centers 208V only  (Call for pricing on all other voltage starters)** | | **Qty** | **WW Part #** | **Unit Price** | **Totals** |
|---|---|---|---|---|---|
| Dryer Motor Control Center 60 HP (No Oscillate/No Disconnect) - (6) 10 HP Motors | | 1 | WW206760-6 | $ 5,541.00 | $ 5,541.00 |
| Dryer Motor Control Center 30 HP (No Oscillate/No Disconnect) - (4) 7.5 HP Motors | | 0 | WW2067-30/4 | $ 3,910.00 | $ - |
| Dryer Motor Control Center 45 HP (No Oscillate/No Disconnect) - (3) 15 HP Motors | | 0 | WW 2067-45 | $ 3,700.00 | $ - |
| Dryer Motor Control Center 40 HP (No Oscillate/No Disconnect) - (4) 10 HP Motors | | 0 | WW 2067-40 | $ 4,020.00 | $ - |
| Dryer Motor Control Center 50 HP (No Oscillate/No Disconnect) - (2) 10 HP & (2) 15 HP Motors | | 0 | WW 2067-50-20/30 | $ 4,560.00 | $ - |

| High Velocity Drying Equipment-Custom Dryer Configurations - Continued (See Washworld High Velocity Dryer Price List) | Qty | WW Part # | Unit Price | Totals |
|---|---|---|---|---|
| **LumenDry-Red LED Lighting Components for High Velocity Dryer** | | | | |
| NEW LumenDry Power Supply and Enclosure -Order light assemblies seperately See Below: **(Maximum of 9 LED Assemblies Total-Sold Separately)** | 0 | 50190017 | $ 675.00 | $ - |
| NEW LumenDry Red LED Lights for Single Producer **(Contains 1 LED Assembly for Single Producer)** Order 1 for EACH Producer Housing-Requires Power Supply P/N 50190017 **(Max 9 Assemblies Combined)** | 0 | 50190018 | $ 340.00 | $ - |
| NEW LumenDry Red LED Lights for Elephant/Air Knive Set **(Contains 4 LED Assemblies)** Order 1 for Each SET of Elephant Trunks/ Air Knives-Requires Power Supply P/N 50190017 **(Max 9 Assemblies Combined)** | 0 | 50190019 | $ 1,295.00 | $ - |
| | | | | |
| **High Velocity Dryer Options and Image Packages** | | | | |
| High Velocity Oscillating Nozzle Option / Single, Pneumatic | 0 | 50190014 | $ 1,845.00 | $ - |
| High Velocity Oscillating Nozzle Option / Dual, Pneumatic | 0 | 50190015 | $ 2,075.00 | $ - |
| Elephant Trunk Side Nozzle (Pair)-Can be used in conjunction with High Velocity Dryers | 0 | 50190010 | $ 2,035.00 | $ - |
| Elephant Trunk Brackets (Pair) for Leg Mount Arch / Note: *Required when utilizing Leg Mount System* | 0 | 50190008 | $ 750.00 | $ - |
| Elephant Trunk Brackets (Pair) for Interior Wall Mount & Exterior Wall Mount Systems | 0 | 50190009 | $ 750.00 | $ - |
| Producer Swivel Backplate, Allows Radial Adjustment for Elephant Trunks (Each) 2 needed for E-Trunks | 0 | 22040020 | $ 135.00 | $ - |
| Nozzle-8" Extension, Composite Dryer Discharge, Rectangle (Each) | 0 | 22040021 | $ 110.00 | $ - |
| Single Dryer Cover (Free Standing Arch Mount) | 0 | 50190004 | $ 1,840.00 | $ - |
| Single Dryer Cover (Interior/Exterior Wall Mount) | 0 | 50190021 | $ 1,840.00 | $ - |
| Single Dryer Cover With Extensions (Free Standing Arch) *"Select when utilizing ET Brackets"* | 0 | 50190006 | $ 2,075.00 | $ - |
| Single Dryer Cover With Extensions (Interior/Exterior Wall Mount) *"Select when utilizing ET Brackets"* | 0 | 50190023 | $ 2,075.00 | $ - |
| Dual Dryer Covers (Free Standing Arch Mount) | 0 | 50190005 | $ 3,675.00 | $ - |
| Dual Dryer Covers (Interior/Exterior Wall Mount) | 0 | 50190022 | $ 3,675.00 | $ - |
| Dual Dryer Covers With Extensions (Free Standing Arch) *"Select when utilizing ET Brackets"* | 0 | 50190007 | $ 3,675.00 | $ - |
| Dual Dryer Covers With Extensions (Interior/Exterior Wall Mount) *"Select when utilizing ET Brackets"* | 0 | 50190024 | $ 3,755.00 | $ - |
| Custom Dryer Cover Decal (per Cover) | 0 | 50770011 | $ 395.00 | $ - |
| NEW Dryer Cover W/LED Wash Instruction Signage, Stop/Drive Forward/Back-Up/Cleaning/Washing/Tri-Foam/Sealant/Spot Free/Drive Slowly **(Substitue One Standard Cover on ANY of the above Dryer Covers. The Price listed is an ADDER)** | 0 | 50190026 | $ 805.00 | $ - |
| NEW LED Dryer Cover Lighting-BLUE (Order W/Any Dryer Image Package-Includes Lighting for 1 Cover) | 0 | 50190016 | $ 415.00 | $ - |
| | | | | |
| **High Velocity Dryer Shut Off Options** | | | | |
| Dryer Shut Off Kit (For Sites without Premium Door Controls) | 1 | WW 20031 | $ 615.00 | $ 615.00 |
| OBD Center Producer Shut Off Kit (For Single Center Producer)-Automatic Shut Off for Open Bed Trucks | 0 | WW 6041 | $ 885.00 | $ - |
| OBD Center Producer Shut Off Kit (For Dual Center Producers)-Automatic Shut Off for Open Bed Trucks | 0 | WW 6042 | $ 930.00 | $ - |
| Center Producer Shut Off Kit (For Single Center Producer)-Free Standing Dryer Version | 0 | WW 6041-FS | $ 1,075.00 | $ - |
| Center Producer Shut Off Kit (For Dual Center Producers)-Free Standing Dryer Version | 0 | WW 6042-FS | $ 1,095.00 | $ - |
| *See Dryer Price List for Additional Dryer Configuration and Mounting Options* | | **Sub Total - Drying Equipment** | $ | 31,521.00 |

| Washworld Water~Wize - Water Treatment Equipment | Qty | WW Part # | Unit Price | Totals |
|---|---|---|---|---|
| **Water Heaters (240v, 480v, 575v 60Hz & 380/415 50Hz Electric Water Heaters call for pricing)** | | | | |

| Description | Qty | WW Part # | Unit Price | Totals |
|---|---|---|---|---|
| Water Heater, High Efficient, 10gpm, 208v, 1phz, w/Circulation Pump and Controller | 0 | WW 20135 | $ 2,935.00 | $ - |
| Water Heater, 208V, 12Kw High Capacity Electric, Stainless Steel Tank (Wall Mount) | 0 | WW 20140 | $ 5,195.00 | $ - |
| Water Heater, 208V, 12Kw High Capacity Electric, Stainless Steel Tank (In-Bay) | 0 | WW 20140-IB | $ 5,195.00 | $ - |
| **Water~Wize Water Softener** (All systems include Electronic Metering and Brine Tank w/Safety Brine Valve) | | | | |
| Twin Alternating Softener, 1" Connection (for PreSoak and RO Only-14 GPM) 60k capacity | 0 | WW 2100T-1 | $ 3,395.00 | $ - |
| Twin Alternating Softener, 1" Connection (for PreSoak and RO Only-17 GPM) 150k capacity | 0 | WW 2101T-1 | $ 4,150.00 | $ - |
| Twin Alternating Softener, 180k capacity, 33gpm peak flow rate, 1 1/4" Connection | 1 | WW 2102T-12 | $ 6,140.00 | $ 6,140.00 |
| Twin Alternating Softener, 300k capacity, 62gpm peak flow rate, 1 1/2" Connection | 0 | WW 2103T-15 | $ 11,090.00 | $ - |
| Twin Alternating Softener, 420k capacity, 62gpm peak flow rate, 1 1/2" Connection | 0 | WW 2104T-15 | $ 13,250.00 | $ - |
| Twin Alternating Softener, 600k capacity, 69gpm peak flow rate, 1 1/2" Connection | 0 | WW 2107T-15 | $ 16,935.00 | $ - |
| Twin Alternating Softener, 300k capacity, 85gpm peak flow rate, 2" Connection | 0 | WW2105T-2 | $ 13,085.00 | $ - |
| Twin Alternating Softener, 420k capacity, 85gpm peak flow rate, 2" Connection | 0 | WW 2106T-2 | $ 15,220.00 | $ - |
| Twin Alternating Softener, 600k capacity, 100gpm peak flow rate, 2" Connection | 0 | WW2108T-2 | $ 18,905.00 | $ - |
| **Water~Wize (RO) System w/Carbon Filter** (Requires Medium Pressure RO Pump WW 20018) | | | | |
| Water~Wize 2400 GPD RO System w/ SS Floor or Wall Mnt Frame, (1) NSF Membrane & SS Housing, 1HP 230v,1Phz SS Pump, Digital TDS Monitor, Auto Membrane Flush, 1 CuFt Auto-Backwashing Carbon Filter and 1" connection & By-Pass Assembly) | 1 | 50220002 | $ 8,075.00 | $ 8,075.00 |
| Water~Wize 4800 GPD RO System w/ SS Floor or Wall Mnt Frame, (2) NSF Membranes & SS Housing, 1HP 230v,1Phz SS Pump, Digital TDS Monitor, Auto Membrane Flush, 1.5 CuFt Auto-Backwashing Carbon Filter and 1" connection & By-Pass Assembly) | 0 | 50220003 | $ 8,875.00 | $ - |
| SS Pump, Digital TDS Monitor, Auto Membrane Flush, 2 CuFt Auto-Backwashing Carbon Filter and 1" connection & By- | 0 | 50220004 | $ 10,025.00 | $ - |
| Washworld Spot Free (RO) Reject Water Reclaim System (Includes 300 Gallon Tank) | 1 | WW 20145 | $ 3,150.00 | $ 3,150.00 |
| **Spot Free (RO) Storage Tanks** | | | | |
| 105 Gallon RO Storage Tank (Approx. 24" Dia. by 80" Tall) | 0 | WW 2115 | $ 890.00 | $ - |
| 300 Gallon RO Storage Tank (Approx. 36" Dia. by 80" Tall) | 1 | WW 2116 | $ 1,295.00 | $ 1,295.00 |
| 500 Gallon RO Storage Tank (Approx. 48" Dia. by 80" Tall) | 0 | WW 2117 | $ 1,445.00 | $ - |
| | | | **Sub Total - Water Treatment** | **$ 18,660.00** |

| Velocity Water Works - Water Treatment Equipment CALL FOR PRICING | Qty | WW Part # | Unit Price | Totals |
|---|---|---|---|---|
| **DRB/ Unitech** | | | | |
| C start main unit/ EMV android and apple pay/ Pos interface/standerd router/Angle cur height base/ extender kit | 6 | Cstart | $ 23,046.00 | $ 138,276.00 |
| 35 GPM Water Reclaim System - Filtered to 5 uM, Air Injected and **10** Gram Ozone Generator, Secondary 5 uM Filter for Constant Cleaning and Circulation of water back through Catch Basin and/or Storage Tanks managing Oxygen levels to reduce the possibility of odor generating bacteria | 0 | 50220031 | Call for Pricing | $ - |
| Generator, Secondary 5 uM Filter for Constant Cleaning and Circulation of water back through Catch Basin and/or Storage | 0 | 50220032 | Call for Pricing | $ - |
| | | | **Sub Total - Velocity Equipment** | **$ 138,276.00** |

| PurClean Reclaim Equipment | Qty | WW Part # | Unit Price | Totals |
|---|---|---|---|---|
| **PurWater Reclaim Systems** (Includes PurClean Retail Handling Fee) | | | | |
| 30gpm, 5 Micron water quality, Air Sparger (Single Bay Application) | 1 | PW1005MAS | $ 21,585.00 | $ 21,585.00 |
| 30gpm, 5 Micron water quality, 4 gram Ozone (Single Bay Application) | 0 | PW1005M04O | $ 27,945.00 | $ - |
| 30gpm, 5 Micron water quality, 8 gram Ozone (Single Bay Application) | 0 | PW1005M08O | $ 32,215.00 | $ - |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 60gpm, 5 Micron water quality, Air xpage Dual Bay Application) | 0 | | | | | 28,230.00 | $ — |
| 60gpm, 5 Micron water quality, 12 gram Ozone  (Dual Bay Application) | 0 | PW2005M12O | $ | 40,275.00 | $ — |
| 60gpm, 5 Micron water quality, 24 gram Ozone  (Dual Bay Application) | 0 | PW2005M24O | $ | 41,835.00 | $ — |
| AQUALINK ADVANCED OXIDATION SYSTEM | 0 | PWAOS | $ | 5,750.00 | $ — |
| AQUALINK II- ADVANCED OXIDATION SYSTEM (SS frame, self flushing option) | 0 | PWAOSII | $ | 12,035.00 | $ — |
| | | Sub Total - Reclaim Equipment | | $ | 21,585.00 |

| Order Instructions: | | |
|---|---|---|
| 1.  Complete Order Form (Including Cover Page) | Sub Total - Wash Equipment | $ 101,635.00 |
| 2.   Email or Fax Completed Order Form to Washworld | Sub Total - Wash Options | $ 28,422.75 |
| 3.  Enclose Down-payment or Wire Transfer 25% Deposit | Sub Total - Signage | $ 6,805.00 |
| 4.  Order will be Tentatively Scheduled for Production after Deposit has been Received | Sub Total - Drying Equipment | $ 31,521.00 |
| 5.  Order Confirmation must be Signed and Returned Via Email or Fax within 48 Hours | Sub Total - WW Water Treatment | $ 18,660.00 |
| 6.  Once Order Confirmation is Received, Order will be Released for Production | Sub Total - Velocity Equipment | $ 138,276.00 |
| | Sub Total - PurClean Equipment | $ 21,585.00 |
| 7.  Final Payment is Due 10 Days Prior to Scheduled Ship Date | | |
| **Change Order Instructions:** | Sub-Total Equipment Package | $ 346,904.75 |
| | Special Discount | $ — |
| 1.  All Changes must be received in writing. | Total Equipment Package | $ 346,904.75 |
| 2. All equiment must be paid in full in full 15 days  before euipment ships  plus 50% of install | Removal of Equipment | $ — |
| 3 Customer is responsible for all permits | Installation | |
| | terminating low voltage | |
| | Plumbing | |
| | Freight | |
| | Sales Tax | $ — |
| | Total | $ 346,904.75 |
| | | $ — |

_____

Accepted By (Customer Signature)

_____

Accepted by Washworld

_____

Print Name

_____

Print Name

_____

Date

_____

Date

# EXHIBIT 3



## ADDENDUM
### Agreement No. 2763169

Ascentium Capital
23970 HWY 59 N
Kingwood, TX 77339-1535
AscentiumCapital.com

**Date: March 7, 2024**

This Addendum changes certain terms and conditions of the document identified below with the number stated above (the "Agreement") by and between Regions Bank d/b/a Ascentium Capital ("Ascentium") and **CAR WASH MANAGEMENT, LLC** ("Customer"), as debtor, customer, lessee, renter, buyer, or borrower, and, if applicable, such changes also apply to all other documents relating to such Agreement including, without limitation, addendums, supplements, schedules, riders, commencement agreements, delivery and acceptance certificates, bills of sale, certifications of financial statements, financial covenant agreements, and security agreements (collectively, the "Other Documents"). If the Agreement is a master agreement, the amendment(s) set forth below shall apply to the master agreement and to all schedules or similar documents incorporating by reference the provisions of that master agreement (except that any change to payment terms, equipment cost, amount financed, interest rate and/or the equipment/collateral description shall apply only to the referenced schedule). Capitalized terms used, but not defined, in this Addendum shall have the meaning set forth in the Agreement.

Name of Agreement: Equipment Finance Agreement

Amendment(s): The Financed Amount is hereby changed from $343,394.23 to $346,904.75. The Payment Schedule is hereby changed from 1 @ $34,339.71, 71 @ $5,918.76 to 1 @ $34,339.71, 1 @ $5,918.76, 70 @ $5,987.29

Customer agrees that execution and/or delivery of this Addendum by electronic means shall be effective as delivery of an original executed Addendum. Upon Customer's execution and delivery of this Addendum to us, this Addendum shall be effective as of the date we accept the Agreement in a separate communication signed by us unless we notify you that we do not accept this Addendum. We may reject your signed Addendum if this Addendum changes payment terms and you delay signing and returning it to us. Customer agrees that a copy of this Addendum, as executed, shall be deemed the equivalent of the originally executed Addendum for all purposes.

| CUSTOMER: | CAR WASH MANAGEMENT, LLC | By: *Jose R Ortiz* |
|---|---|---|
| | | Printed Name/Title: JOSE RENE ORTIZ Member |

1641-20230811

# EXHIBIT 4



**ascentium** CAPITAL

23970 Highway 59 N Kingwood, TX 77339

## Funding Instructions

**Please complete form, sign & and return to Ascentium Capital.**
**If you have any questions, please contact your finance manager.**

Name:
Fax:                                     Phone:
Email:

---

### Section 1 – Choose Funding Method (Choose one):

☒ **ACH / Direct Deposit**
(Complete Sections 2 & 3, sign below & attach voided check)

☐ **U.S. Regular Mail**
(Complete Section 2 only & sign below)

☐ **UPS Overnight Delivery**
(Complete Section 2 only & sign below)

### Section 2 – Payee Information: Company:

Name  **Washworld, Inc**                          Federal Tax ID #  **74-3050493**

Company's Physical Address (Not a PO Box)  **2222 American Blvd**

City  **De Pere**              State  **WI**        ZIP  **54115**

Email Address  **controller@washworldinc.com**       Phone #  **920-425-7427**

### Section 3 – For ACH / Direct Deposit Only:

Financial Institution Name  **Bank First**

9 Digit Routing #  **075901134**                    Account #  **83010268**

Account Type   ☒ Checking  ☐ Savings

### Section 4 – Delivery of Equipment/Other Terms:

Payee will give at least thirty (30) days advance written notice to Ascentium Capital ("Ascentium") regarding any changes in its depository financial institution or other instructions. Payee agrees any funds received from Ascentium are for the sole purpose of advancing funds for Payee's customer to pay the purchase orders, invoices, quotes or proposals for the application transaction. If funds to which Payee is not entitled are deposited into Payee's account or otherwise received by Payee, Payee agrees to promptly remit any such funds to, or as directed by Ascentium. Payee agrees to deliver any equipment which is the subject of these Funding Instructions to customer's address set forth in the purchase orders, invoices, quotes or proposals for the applicable transaction, unless Ascentium agrees to an alternate delivery address in writing. Payee agrees that a facsimile or other copy of this document, as executed, shall be deemed the equivalent of the originally executed copy for all purposes.

Ascentium is fully committed to making financial products and services available to all applicants and customers on a fair and responsible basis and ensuring full compliance with applicable fair lending laws and regulations. For further information, please see Ascentium's Fair and Responsible Lending Policy Statement.

### Signature (Sign Below)

Individual's Printed Name  **Jon Tyczkowski**            Title  **Controller**

Individual's Signature  **Jon Tyczkowski**               Date  **2/28/23**

---

### FOR ACH / DIRECT DEPOSIT: VOIDED CHECK GOES HERE

Fax To: 866.846.3680 or Email To: VSR@AscentiumCapital.com

For more information on electronic ACH payments, please visit www.nacha.org where fact sheets and publications are available to assist you with all of your corporate payment educational needs.

**Thank you for your business. We look forward to our shared successes.**

# WASHWORLD

2222 American Blvd
De Pere, WI 54115
(920) 338-9278

79-113/759

NUMBER

64112

PAY

DATE

AMOUNT

TO THE
ORDER
OF

WASHWORLD Inc

BankFirst
NATIONAL

For Better Banking.
Think First.
BankFirstNational.com

Shield

AUTHORIZED SIGNATURE

TRUE WATERMARK PAPER - HOLD TO LIGHT TO VIEW

HEAT SENSITIVE RED IMAGE DISAPPEARS WITH HEAT

⑈064112⑈ ⑊075901134⑊ 8⑈301⑈0268⑈

WASHWORLD Inc

64112

WASHWORLD Inc

64112

SF4001HGTOP-1SC

REORDER FROM YOUR LOCAL SAFEGUARD DISTRIBUTOR, IF UNKNOWN, CALL 800-523-2422

C9FMW00010000    B18SF017110

Safeguard    LITHO USA    SFHG1  CK7SHG111H

# EXHIBIT 5



**Payment Notification**

**For:** Wash World Inc
2222 American Blvd
De Pere, WI 54115

Thank you for choosing Ascentium Capital for your customer's financing needs. We value your patronage and are committed to bringing you best-in-class service.

This email notifies you that we have issued a payment for your customer's financing. Following is the information related to our payment to you.



This payment is for:

| Invoice #: | Car Wash Management, LLC |
|---|---|
| Payment Type: | Equipment |
| Customer Name: | Car Wash Management, LLC |
| Finance Agreement #: | 2763169 |

You will receive:



| Payment Method: | ACH |
|---|---|
| Date: | Mar 11 2024 |
| Amount: | $309,054.80 |



Ascentium has initiated an electronic funds transfer to your bank account for the financing deal #2763169. It will reflect in your bank account by the end of the business day tomorrow.



If you have questions about this payment, please contact your Vendor Services Representative, Maria Negri, at MariaNegri@AscentiumCapital.com or (281) 902-1938.



Ascentium is committed to providing applicants and customers with an exceptional financing experience. For further information on how you can assist us with this commitment, please see Ascentium's Shared Commitments.

**For all of your customer financing needs,** please contact your Ascentium Capital sales representative, Pete Matheny, at PeteMatheny@AscentiumCapital.com or 281.883.0201.

23970 Highway 59 N

Kingwood, TX 77339

www.AscentiumCapital.com

# EXHIBIT 6



Ascentium Capital
23970 Highway 59 North
Kingwood, Texas 77339

Jerry L. Noon, Vice President
jerrynoon@ascentiumcapital.com
T: (281) 348-2013
F: (866) 846-3679

October 30, 2024

| | |
|---|---|
| **VIA U.S. MAIL AND EMAIL**<br><br>Car Wash Management LLC<br>12136 Avenida Sivrita<br>San Diego, California 92128<br>Email: andrew@sandiegoautoshine.com<br>Email: andrew@carwashmgmt.com<br>Email: John@carwashmgmt.com<br>Email: rene@carwashmgmt.com<br>Email: accounting@carwashmgmt.com | **VIA U.S. MAIL AND EMAIL**<br><br>Car Wash Management LLC<br>7776 Trade Street, Ste E<br>San Diego, California 92121<br>Email: andrew@sandiegoautoshine.com<br>Email: andrew@carwashmgmt.com<br>Email: John@carwashmgmt.com<br>Email: rene@carwashmgmt.com<br>Email: accounting@carwashmgmt.com |
| **VIA U.S. MAIL AND EMAIL**<br><br>Car Wash Management LLC<br>310 S Vincent Ave<br>West Covina, California 91790<br>Email: andrew@sandiegoautoshine.com<br>Email: andrew@carwashmgmt.com<br>Email: John@carwashmgmt.com<br>Email: rene@carwashmgmt.com<br>Email: accounting@carwashmgmt.com | **VIA U.S. MAIL AND EMAIL**<br><br>West Covina Car Wash LLC<br>7776 Trade Street, Ste E<br>San Diego, California 92121<br>Email: andrew@sandiegoautoshine.com<br>Email: andrew@carwashmgmt.com<br>Email: John@carwashmgmt.com<br>Email: rene@carwashmgmt.com<br>Email: accounting@carwashmgmt.com |

Car Wash Management LLC
October 30, 2024
Page 2

<table>
<tr><td><b><u>VIA U.S. MAIL AND EMAIL</u></b><br><br>West Covina Car Wash LLC<br>310 S Vincent Ave<br>West Covina, California 91790<br>Email: andrew@sandiegoautoshine.com<br>Email: andrew@carwashmgmt.com<br>Email: John@carwashmgmt.com<br>Email: rene@carwashmgmt.com<br>Email: accounting@carwashmgmt.com</td><td><b><u>VIA U.S. MAIL AND EMAIL</u></b><br><br>Jose R Ortiz<br>402 Addleman Ave<br>West Covina, California 91792<br>Email: rene@carwashmgmt.com</td></tr>
</table>

RE:  Regions Bank d/b/a Ascentium Capital ("Ascentium"); Equipment Finance Agreement No. 2763169 (the "EFA") with Car Wash Management LLC ("Debtor") and West Covina Car Wash LLC and Jose R Ortiz ("Guarantors")

# <u>NOTICE OF DEFAULT AND ACCELERATION</u>

Ladies and Gentlemen:

On or about January 10, 2024, Debtor entered into the EFA with Ascentium in order to finance Debtor's acquisition of equipment from Wash World Inc (the "Collateral").

The Guarantors unconditionally guaranteed the payment and performance when due of all obligations of Debtor under the EFA, and all related documents executed by Debtor. The Guarantors further agreed that Ascentium may proceed against the Guarantors before proceeding against Debtor.

The EFA is past due because Debtor has failed to pay the monthly payment due October 15, 2024.  In addition, Ascentium has been advised that the Collateral was never received nor installed and further, that Debtor has intentionally misdirected the Ascentium loan funding proceeds for the use of an unauthorized third party for unauthorized collateral which on information and belief has been installed in an unauthorized third party location.  Therefore, the EFA is in Default (as defined in the EFA).  In accordance with its rights and remedies under the EFA, Ascentium hereby accelerates and declares the entire balance of the EFA immediately due and payable.  Pursuant to the default and remedies section of the EFA, Ascentium is required to discount future payments.  The accelerated amount is detailed below:

Car Wash Management LLC
October 30, 2024
Page 3

| EFA 2763169 | ($) |
|---|---|
| Past Due Payments: | 5,957.29 |
| Late Charges: | 648.72 |
| Insurance Charges: | 499.94 |
| Future Payments Accelerated (3% present value discount applied): | 343,891.05 |
| *TOTAL: | 350,997.00 |

*Per diem interest accrues at $172.53*

Accordingly, **DEMAND IS MADE for payment of $350,997.00, plus default interest accruing in the amount of $172.53 per day,** and all other contractually-applicable charges, the total of which must be received at Ascentium's office at 23970 Highway 59 N., Kingwood, Texas, 77339, no later than ten (10) days from the date of this letter.

Pursuant to its rights under the EFA and applicable law, Ascentium is entitled to take possession of the Collateral. The Collateral is being withheld from Ascentium in violation of Ascentium's rights. Accordingly, **DEMAND IS MADE to do the following**:

1. Cease taking any action to sell, use, assign or dispose of the Collateral;

2. Immediately deliver to Ascentium any proceeds of the Collateral;

3. Assemble and surrender the Collateral to Ascentium at a time and place acceptable to Ascentium; and

4. Stop using, transferring, withdrawing or encumbering any funds on deposit in any financial institution at which proceeds of the Collateral have been deposited and immediately pay all such funds to Ascentium.

Please contact the undersigned to make arrangements for the surrender of the Collateral (in which event the Debtor and Guarantors shall remain jointly and severally liable for the debt and any deficiency balance).

If any payment less than the full indebtedness demanded above is delivered to Ascentium, such payment will be applied to said indebtedness (in any sequence Ascentium selects in its sole discretion), with full reservation of all of Ascentium's rights and remedies and without waiver of or prejudice to any of Ascentium's rights or remedies. Moreover, any such partial payment shall not cure any default under the EFA, and such payment shall not reinstate or de-accelerate any indebtedness under the EFA. Therefore, unless the demand stated above is timely and fully satisfied, or this matter is otherwise resolved with written documentation acceptable to Ascentium in its sole discretion, Ascentium will immediately take all further steps it deems appropriate, including and without limitation commencing a legal action against you for all available relief.

Car Wash Management LLC
October 30, 2024
Page 4

_____

Please note that Ascentium has no obligation or duty to inform Debtor or Guarantors of Ascentium's intention to exercise its rights and remedies except as expressly required by the EFA or applicable law. Ascentium is, however, doing so in this letter as a courtesy.

Please be advised that this letter is not one in a series of demand letters you will receive in connection with this matter and if the terms of the EFA and other related documents are not complied with litigation will be the next step and Debtor and Guarantors will also be liable for all attorney's fees and costs incurred in such litigation.

To the extent your obligations have been discharged, dismissed, or are subject to an automatic stay under Title 11 of the United States Code, this notice is for compliance and informational purposes only and does not constitute a demand for payment or any attempt to collect any such obligation. This notice is given pursuant to 11 U.S.C. § 362(b) (11), if applicable.

This letter is not an all-inclusive statement of Ascentium's rights or remedies against any person or entity. Moreover, nothing stated in or omitted from this letter is a waiver of, or has any adverse effect on, any of Ascentium's rights or remedies, and all such rights and remedies are cumulative, may be exercised in any such order as Ascentium elects, and are expressly reserved.

THIS IS AN ATTEMPT TO COLLECT THE INDEBTEDNESS EVIDENCED BY THE EFA, AND/OR SECURED BY THE LIENS, SECURITY INTERESTS, AND TERMS AND PROVISIONS CONTAINED IN THE EFA, AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. PLEASE BE GOVERNED ACCORDINGLY.

Sincerely,
Regions Bank d/b/a Ascentium Capital

Jerry L. Noon
Vice President, Asset Management

# EXHIBIT 7



**PERSONAL GUARANTY**

Agreement No. 2763169

Ascentium Capital
23970 HWY 59 N
Kingwood, TX 77339-1535
AscentiumCapital.com

| Obligor Name: | CAR WASH MANAGEMENT, LLC ("Obligor") |
|---|---|

The undersigned individual(s) ("you", "your") unconditionally guarantee to Regions Bank d/b/a Ascentium Capital and our successors and assigns ("we", "us" or "our") the prompt payment and performance when due of all of the obligations of the Obligor (named above) under the lease agreement, rental agreement, equipment finance agreement, installment payment agreement, loan and security agreement, or similar agreement (including schedules to master agreements) whose Agreement number is referenced above ("Agreement"), entered between us and the Obligor, as lessee, renter, debtor, or other obligor and all related documents executed by the Obligor (collectively, "Agreements").

We may proceed against you before proceeding against the Obligor, any collateral or any leased equipment under the Agreements, or enforcing any other remedy. Notwithstanding any changes made to the Agreements in our dealings with Obligor, this Guaranty will remain in effect with respect to the Agreements as so changed even if you are not notified of the changes and will remain in effect even if the Agreements or any of them are no longer enforceable against the Obligor. You waive all presentments, demands for performance, notices of protest, notices of dishonor, notices of acceptance of this Guaranty and all other notices to which you may have a right. You agree to pay us all our expenses in enforcing this Guaranty. You may not assign this Guaranty without our written consent.

This Guaranty shall be governed by the laws of the jurisdiction governing the Agreement. **You consent to non-exclusive jurisdiction of the courts in Jefferson County, Alabama in any action to enforce this Guaranty, waive any objection based on improper venue and waive any right to a jury trial.** The notice provisions in the Agreement shall apply to this Guaranty except that any notice to you, if delivered by mail, will be sent to your current address shown in our records. You agree that by providing us with an email address or a phone number, you expressly consent to receiving notices and other communications including voice and text messages from us at that number or email address, and this express consent applies to each such email address or phone number that you provide to us now or in the future.

If there is more than one guarantor of the Obligor's obligations under the Agreements, the liabilities of each such guarantor shall be joint and several. This Guaranty shall inure to our benefit and our successors and assigns, and shall be binding upon you, your successors and permitted assigns. You agree this Guaranty may be signed and delivered electronically. A facsimile or other copy of this Guaranty, as executed, shall be deemed the equivalent of the original for all purposes. This Guaranty may be executed in separate counterparts which together shall constitute one and the same instrument. You consent to our conducting a credit evaluation of you from all sources, periodically updating it and sharing the results with others.

Each of the undersigned has duly executed this Guaranty, effective as of January 5, 2024.

**PLEASE SIGN BELOW**

| Printed Name: | JOSE RENE ORTIZ | Guarantor Signature: | |
|---|---|---|---|
| Printed Name: | | Guarantor Signature: | |
| Printed Name: | | Guarantor Signature: | |
| Printed Name: | | Guarantor Signature: | |

3296-20230508

# EXHIBIT 8



**GUARANTY**
**Agreement No. 2763169**

Ascentium Capital
23970 HWY 59 N
Kingwood, TX 77339-1535
AscentiumCapital.com

We use the words **you** and **your** to mean the undersigned Guarantor. The words **we**, **us**, and **our** refer to Regions Bank d/b/a Ascentium Capital and its successors and assigns.

For valuable consideration, receipt of which is hereby acknowledged, you hereby unconditionally guarantee and promise on demand (i) to pay us in lawful money of the United States all periodic rent, debt service, scheduled payments of purchase price and other sums required to be paid under the terms of (A) the equipment lease, equipment finance agreement, note and security agreement, loan and security agreement, conditional sale agreement or similar agreement (including schedules to master agreements) whose Agreement number is referenced above ("Agreement"), entered between us and **CAR WASH MANAGEMENT, LLC** (hereinafter called "Obligor"), as lessee, debtor, buyer or other obligor, and (B) any document relating to such Agreement representing any obligation from Obligor to us, including, without limitation, bills of sale, security agreements, evidence of indebtedness, progress payment agreements or lease commencement agreements (collectively, "Other Documents") in the amounts, at the times and in the manner set forth in such Agreement or Other Documents, and (ii) to perform, at the time and in the manner set forth in such Agreement, all of the terms, covenants and conditions, therein required to be kept, observed or performed by Obligor, and (iii) to perform, at the times and in the manner set forth in the Other Documents, all of the terms, covenants and conditions therein required to be kept, observed and performed by Obligor. You shall pay all of the foregoing amounts and perform all of the foregoing terms, covenants and conditions notwithstanding that such Agreement or any of the Other Documents, or any obligations performed or to be performed thereunder, shall be void or voidable as against Obligor or any of Obligor's creditors, including a trustee in bankruptcy of Obligor, by reason of any fact or circumstance including without limiting the generality of the foregoing, failure by any person to file and document or to take any other action to make the Agreement or any of the Other Documents enforceable in accordance with their terms.

This Guaranty is a continuing one and shall terminate only upon full payment of all rents, debt service, scheduled payments of purchase price and all other sums due under the Agreement and the Other Documents and the performance of all the terms, covenants and conditions therein required to be kept, observed or performed by the Obligor. All indebtedness, now existing or hereafter arising, between Obligor and you is hereby subordinated to all present and future obligations of Obligor or you to us, including, but not limited to, the obligations set forth in the Agreement and Other Documents and no payment shall be made or accepted on any such indebtedness due Obligor or you until all of such obligations to us are paid and satisfied in full. This Guaranty is a guarantee of payment and performance and not of collection only.

You authorize us, without notice or demand, and without affecting your liability hereunder, from time to time in the course of our dealings with the Obligor to: (a) change the amount, time or manner of payment of rent, debt service, scheduled payment of purchase price or other sums required to paid under the terms of the Agreement and Other Documents; (b) change any of the terms, covenants, conditions or provisions of the Agreement or Other Documents; (c) amend, modify, change or supplement the Agreement and Other Documents; (d) assign the Agreement and Other Documents or the rents, debt service, scheduled payments of purchase price or other sums payable under the Agreement and Other Documents; (e) consent to Obligor's assignment of the Agreement and Other Documents or to the subleasing or subfinancing or use by any third party (other than Obligor) of all, or any portion, of the property covered by the Agreement; (f) take and hold security for the payment of this Guaranty or the performance of the Agreement and Other Documents, and exchange, enforce, waive and finance any such security; and (g) apply such security and direct the order of manner of sale thereof as we in our **sole** discretion may determine. We may without notice assign this Guaranty in whole or in part. You shall not assign this Guaranty without our prior written consent.

You waive any right to require us, before demanding from you the payment or performance from you specified above to; (a) proceed against Obligor; (b) proceed against or exhaust any property leased, financed or otherwise in the possession of Obligor pursuant to the Agreement or other security leased to or held from Obligor; (c) pursue any other remedy in Our power whatsoever; or (d) notify You of any default by Obligor in the payment of any rent, debt service, scheduled payment of purchase price or other sums required to be made under the terms of the Agreement or Other Documents or in the performance of any terms, covenants or conditions herein required to be kept, observed or performed by the Obligor. You waive any defense arising by reason of any disability or other defense of Obligor or by reason of the cessation from any cause whatsoever of the liability of the Obligor. You shall have no right of subrogation and waive any right to enforce any remedy which we now have or may hereafter have against Obligor, as well as any right of indemnity against Obligor for any obligations which you may perform with respect to the Agreement or Other Documents, and waive any benefit of, and any right to participate in, any security now or hereafter held by us. You waive all presentments, demands for performance, notices of non-performance, protests, notices of protest, notices of dishonor and notices of acceptance of this Guaranty and all other notices to which you may have a right.

You agree to pay attorneys' fees and all other costs and expenses, which may be incurred by us in the enforcement of this Guaranty.

You represent and warrant to us that: (a) you are a corporation, limited liability company or other entity duly organized and existing in good standing in the jurisdiction of your formation and have full power and authority to make and deliver this Guaranty; (b) the execution, delivery and performance of this Guaranty have been duly authorized by all necessary corporate, limited liability company or equivalent action and do not and will not violate the provisions of any presently applicable law or its articles of incorporation or other constituent documents or bylaws or any agreement presently

331-20230401

binding on you; and (c) this Guaranty has been duly executed and delivered by your authorized representatives and constitutes your lawful, binding and legally enforceable obligation.

You authorize us to conduct a credit evaluation of you and to share any such information with others. In connection with such evaluation you authorize us contact credit reporting agencies and others and you direct such parties to supply to us all information concerning you in their possession; you further authorize us to conduct updates of our evaluation during the term of the Agreement. Your obligations hereunder are in addition to and shall be cumulative with all other obligations of yours to us as guarantor or otherwise, and are independent of the obligations of the Obligor. A separate action or actions may be brought and prosecuted against you, whether an action is brought against Obligor or whether Obligor be joined in any such action or actions and **YOU WAIVE INSOFAR AS PERMITTED BY LAW, TRIAL BY JURY IN ANY ACTION, PROCEEDING OR LITIGATION BETWEEN OR AMONG OBLIGOR, YOU OR US. NEITHER YOU NOR US SHALL BE LIABLE FOR SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES IN ANY ACTION OR PROCEEDING RELATING TO THIS GUARANTY. YOU CONSENT TO THE NON-EXCLUSIVE JURISDICTION OF THE FEDERAL AND STATE COURTS LOCATED IN JEFFERSON COUNTY, ALABAMA IN ANY ACTION OR PROCEEDING RELATING TO THIS GUARANTY AND YOU WAIVE ANY RIGHT YOU MIGHT HAVE TO OBJECT TO ANY SUCH ACTION OR PROCEEDING ON THE GROUNDS IT IS AN INCONVENIENT FORUM.** This Guaranty shall be governed by and construed in accordance with the laws of the jurisdiction governing the Agreement.

This Guaranty shall inure to our benefit or that of our successors and assigns, and shall be binding upon you, your heirs, personal representatives, successors and permitted assigns.

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT: To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

IN WITNESS WHEREOF the undersigned has duly executed this Guaranty on January 5, 2024. A facsimile or other copy of this Guaranty, as executed, shall be deemed the equivalent of the original for all purposes. This Guaranty may be executed in separate counterparts which together shall constitute one and the same instrument.

| GUARANTOR: | West Covina Car Wash LLC<br>By: CAR WASH MANAGEMENT, LLC, Member<br>By: Jose Rene Ortiz, Member | Federal Tax ID | 83-3696052 |
|---|---|---|---|
| Business Address: | 310 S VINCENT AVE STE A, WEST COVINA, CA, 91790 | | |
| Signature: | ☒ _(signature)_ | Printed Name, Title: | JOSE RENE ORTIZ, Member |

331-20230401

# EXHIBIT 2

Andrew K. Alper (State Bar No. 088876)
aalper@frandzel.com
Thomas M. Robins (State Bar No. 054423)
trobins@frandzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 Wilshire Boulevard, Nineteenth Floor
Los Angeles, California 90017-2427
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Plaintiff,
REGIONS BANK, an Alabama State
Bank, dba Ascentium Capital

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| REGIONS BANK, an Alabama State Bank dba ASCENTIUM CAPITAL,<br><br>Plaintiff,<br><br>v.<br><br>CAR WASH MANAGEMENT, LLC, a Delaware Limited Liability Company, CAR WASH MANAGEMENT, LLC, a Hawaii Limited Liability Company, WEST COVINA CAR WASH LLC, a California Limited Liability Company, JOSE RENE ORTIZ, aka JOSE R. ORTIZ, aka JOSE ORTIZ, an individual, ANDREW PAUL WILLIAMS, aka ANDREW P. WILLIAMS, aka ANDREW WILLIAMS, an individual, WASHWORLD, INC., a Wisconsin Corporation, DOES 1-100, inclusive,<br><br>Defendants. | Case No. **25-CV-00359 CAS (KSx)**<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>1. **BREACH OF EQUIPMENT FINANCE AGREEMENT**<br><br>2. **BREACH OF GUARANTY**<br><br>3. **BREACH OF GUARANTY**<br><br>4. **FRAUD/CONCEALMENT**<br><br>5. **RECOVERY FOR PAYMENT OF MONEY BY MISTAKE, UNJUST ENRICHMENT**<br><br>6. **BREACH OF CONTRACT**<br><br>7. **MONEY HAD AND RECEIVED**<br><br>8. **CONVERSION** |

Plaintiff complains as follows:

**GENERAL ALLEGATIONS**

**A.     Parties**

1.      At all times herein mentioned, Plaintiff Regions Bank, was and is an Alabama State Bank with its principal place of business in the State of Alabama. Regions Bank is doing business under the name of Ascentium Capital.  At all times herein mentioned Regions Bank, is and has been qualified to conduct business in the State of California and is referred to herein as "Ascentium."

2.      Ascentium is informed and believes and therein alleges that at all times herein mentioned, Defendant Car Wash Management, LLC was and is a limited liability company, organized and existing under the laws of the State of Delaware with its principal place of business in the City of West Covina, County of Los Angeles, State of California ("CWM" or "Debtor"). Ascentium also is informed and believes and therein alleges that at all times herein mentioned there exists, or at one time existed, a Hawaii limited liability company with the name Car Wash Management, LLC, which had or has one or more of the same members / managers as the Delaware entity.  While Ascentium believes that the contracting entity in this case was and is the Delaware entity, whenever reference is made to "Debtor" or "CWM" it shall be deemed to collectively refer to both entities. Ascentium is further informed and believes and thereon alleges that there are no members who are citizens of the State of Alabama.

3.      Ascentium is informed and believes and therein alleges that at all times herein mentioned Defendant West Covina Car Wash LLC was and is a limited liability company, organized and existing under the laws of the State of California with its principal place of business in the City of West Covina, County of Los Angeles, State of California whose sole member is CWM ("WCCW"). Ascentium is informed and believes and thereon alleges that there are no members of WCCW who are residents of the State of Alabama. In fact, Ascentium is informed and believes and thereon alleges that its sole member is CWM.

4.      At all times herein mentioned, Defendant, Jose Rene Ortiz, aka Jose R. Ortiz; aka

5443173v25852240v1 | 100287-0289

2

COMPLAINT

Jose Ortiz ("Ortiz"), was and is an individual who was and is a member of CWM and resides in the City of West Covina, County of Los Angeles, State of California.

5.    At all times herein mentioned, Defendant Andrew Paul Williams, aka Andrew P. Williams, aka Andrew Williams ("Williams") was and is an individual who was and is a member and/or officer of CWM and resides in the County of San Diego, State of California.

6.    Ascentium is informed and believes and therein alleges that at all times herein mentioned, Defendant Washworld, Inc. was and is a corporation organized and existing under the laws of the State of Wisconsin with its principal place of business in Wisconsin and is authorized to and doing business in the County of Los Angeles, State of California ("Washworld"). Ascentium is informed and believes and thereon alleges that no officers or directors are residents of the State of Alabama.

7.    The true names and capacities, whether individual, corporate, partnership, association, limited liability company or otherwise are unknown to Ascentium who therefore sues such defendants by such fictitious names as Does 1-100, Inclusive.  Ascentium is informed and believes and thereon alleges that no fictitiously named Defendant is a resident or citizen of Alabama. Ascentium is informed and believes and therein alleges that each of the fictitiously named defendants is in some manner responsible for the events and damages alleged herein. When the true names and capacities and connection of such fictitious defendants are ascertained, Ascentium will seek leave to amend this complaint accordingly or will name such defendants as a Doe defendant.

8.    Ascentium is informed and believes and therein alleges that at all times herein mentioned each of the defendants that is named in the caption of this Complaint was and/or is the agent, officer, employee, joint venturer, aider and abettor and/or co-conspirator of each other defendants, and in acting and/or failing to act as alleged herein, was so doing in the course and scope of such capacity and relationship.

**B.    Jurisdiction and Venue**

9.    Jurisdiction is proper under 28 U.S.C. §1332(a) in that there is complete diversity

5443173v25852240v1 | 100287-0289

3

COMPLAINT

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

of citizenship between Ascentium and all Defendants and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

10.    Venue is proper in this Court because a substantial part of the events or omissions giving rise to the causes of action in this Complaint occurred in this District in Los Angeles County, California and  Defendant Ortiz resides in this District and defendants CWM and WCCW do business in this District. In addition, Plaintiff is informed and believes that the personal property which is the subject of the allegations in this case ~~is~~may be within this Judicial District.

~~C.    The CWM Equipment Finance Agreement~~

11.    This action is not subject to the provisions of Section 2981, et seq. (Rees-Levering Act) and/or Section 1801 et seq. (Unruh Act) of the Civil Code of the State of California.

**C.    The CWM Equipment Finance Agreement**

12.    On or about January 10, 2024, CWM, as "Debtor," with a listed address of 310 S. Vincent Ave., West Covina, CA 91790, entered into Equipment Financing Agreement No. 2763169 (the "EFA") with Ascentium in order to finance the acquisition of equipment for the financed amount of $343,394.23 to be repaid with one initial payment of $34,339.71 and 71 monthly payments of $5,918.76.  CWM is also sometimes referred to herein not only as CWM but as Debtor.  In connection with execution of the EFA, Debtor also executed the following documents:  Authorization to Perform Verbal Verification, Prepayment Addendum, Authority and Incumbency Certificate,  and Commencement Agreement whereby Debtor requested that Ascentium pay the supplier of the Equipment before the Equipment was delivered, installed and operational.  True and correct copies of the EFA and the other documents described in this paragraph are attached hereto collectively as Exhibit "1" and incorporated herein by this reference.  Reference to the "EFA" shall include all of the documents described in this paragraph. The EFA was to finance Debtor's purchase of equipment for the operation of a car wash initially from a vendor identified as AVW Equipment Company, Inc. ("AVW").  Pursuant to the EFA, Ascentium wired $309,054.80 of the $343,394.23 to AVW.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

**D.    The Amendment and Switch to Washworld as Vendor**

13.    After the EFA was signed, on or about February 28, 2024, Williams, on behalf of Debtor, orally represented to Pete Matheny, a Vice President of Ascentium, that AVW was unable to deliver the equipment ~~ordered~~purchased  by CWM in a timely fashion and that CWM had experienced other "red flags" regarding some business practices of AVW.  Accordingly, CWM was canceling the ~~order~~purchase with AVW, obtaining a full refund of the Ascentium funding proceeds from AVW, and was ~~ordering~~purchasing the necessary equipment from Washworld. This representation was confirmed in a February 28, 2024 email from Williams to Matheny, that was copied to Ortiz, and which transmitted what was represented to be a purchase quote from a different vendor- Washworld on a Washworld form, a true and correct copy of which is attached hereto as Exhibit 2 and incorporated herein by this reference ("the Quote").  The equipment set forth in the EFA and Quote is hereinafter referred to as "the Equipment." The money paid to AVM was refunded to Ascentium.

14.    Based on the representations of Williams, alleged above, on or about March 7, 2024, Ascentium prepared and sent to CWM and CWM, by Ortiz, executed and delivered to Ascentium an Addendum, Agreement No. 2763169 changing the amount financed from $343,394.23 to $346,904.75 and also changing the  payment schedule ~~for~~from 1 payment at $34,339.71, followed by 71 payments at $5,918.76, to 1 payment at $~~5,918.76 and~~34,339.71 followed by 1 payment at  $5,987.29, followed by 70 payments at $~~5,987.29~~5,987,29, a true and correct copy of which is attached hereto as Exhibit "3" and incorporated herein by this reference. On or about March 11, 2024, Ortiz verbally acknowledged to Ascentium and Ascentium documented that communication with Ortiz that the Equipment had been received by CWM.

**E.    The Relationship Between CWM and Washworld**

15.    Ascentium is informed and believes and therein alleges that, at the time of the February 28, 2024, email referred to in paragraph 12, CWM was an authorized ~~dealer~~distributor of Washworld products.  Prior to the CWM transaction in February, 2024, Ascentium had funded two unrelated loan transactions to different customers in the form of Equipment Finance

~~5443173v2~~5852240v1 | 100287-0289

5

COMPLAINT

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

Agreements involving the purchase of Washworld equipment where CWM had been the "primary vendor" to Ascentium's customer and approximately another 20 transactions where Washworld had been the "primary vendor" or one of its other distributors had been the "primary vendor." Ascentium is informed and believes and thereon alleges that at all times herein mentioned the relationship between CWM and Washworld was such that CWM was given access to and was authorized to issue quotes on Washworld forms, such as the quote Williams sent to Ascentium set forth in paragraph 12. Further, the custom and practice between Ascentium and Washworld is that most of the time these Orders were not signed by Washworld.

**F.    The Washworld Funding Instructions**

16.    In connection with Ascentium's past dealings with Washworld, on or about February 28, 2023, Washworld, by its controller, Jon Tyezkowski, an authorized representative, executed and delivered to Ascentium written "Funding Instructions", a true and correct copy of which is attached hereto as Exhibit "4" and incorporated herein by this reference.  The Funding Instructions listed Washworld's email address as "controller@washworldinc.com" and provided, among other things:

> Payee [Washworld] agrees any funds received from Ascentium are for the sole purpose of advancing funds for Payee's customer to pay the purchase orders, invoices, quotes, or proposals for the application transaction.  If funds to which Payee is not entitled are deposited into Payee's account or otherwise received by Payee, Payee agrees to promptly remit any such funds to or as directed by Ascentium.

**G.    The Mistaken Payment**

17.    On March 12, 2024, Ascentium sent an email to ajohnson@washworldinc.com and controller@washworldinc.com transmitting a "Payment Notification" stating:

| Invoice # : | Car Wash Management, Inc. |
|---|---|
| Payment Type : | Equipment |
| Customer Name : | Car Wash Management, Inc. |
| Finance Agreement # : | 2763169 |
| Payment Method : | ACH |
| Date : | March 11, 2024 |
| Amount : | $309,054.80 |

Among other things, the Payment Notification stated:

> If you have questions about this payment, please contact your

Vendor Services Representative, Maria Negri, at MariaNegri@ascentiumcapital.com or (281) 902-1938.

18.    Ascentium in fact sent payment by Automated Clearinghouse Debit ("ACH") to Washworld in the amount of $309,954.00 on March 11, 2024 (the "Mistaken Payment") for posting to the Washworld bank account listed in the Funding Instructions, and, on information and belief, same was posted and credited to such account on March 12, 2024. A true and correct copy of evidence of the Mistaken Payment is attached hereto, marked Exhibit "5" and incorporated herein by this reference.

19.    Despite the fact that Washworld could not reconcile or match the funding it received from Ascentium to any Order it had issued (as opposed to all other previous customer orders that Ascentium had funded to Washworld which had a clear match to the Order total and amount funded, at no time did Washworld contact Maria Negri or anyone else at Ascentium regarding the receipt of this CWM payment or inquire why that payment was made or what Order it was for. At no time did Washworld reference the Finance Agreement # referred to above to contact Ascentium regarding receipt of the payment.

**H.    The Fraud**

20.    ~~19.~~ Ascentium is informed and believes and therein alleges that Washworld alleges and contends that CWM ~~never~~ever sent the Quote or Order, Exhibit "2", to Washworld and never ordered, or intended to order, any of the equipment stated in the Quote identified in paragraph 12, Exhibit "2" from Washworld.

21.    ~~20.~~ Ascentium is informed and believes and therein alleges that when Washworld received the Mistaken Payment, it knew, had reason to know and/or should have known that there had been no order for equipment from CWM for either itself or a customer of CWM in the amount of the Mistaken Payment or in any amount even approaching the amount of the Mistaken Payment to which Ascentium was the lender.

22.    ~~21.~~ Instead of contacting Ascentium regarding the Mistaken Payment as stated in the Payment Notice and as required by the Funding Instructions, Ascentium is informed and believes and therein alleges that Washworld contacted CWM regarding the Mistaken Payment and

~~5443173v2~~5852240v1 | 100287-0289

7

COMPLAINT

was told by CWM that the payment should be applied to an order by one of its customers Conserv Fuels, located in Chula Vista, California, that had a remaining balance due of $132,509.09 on a prior CWM/Washworld Order unrelated to Ascentium and that Washworld applied a portion of the Mistaken Payment to pay that balance and sent a payment back to CWM in the amount of $176,552.71 on March 19, 2024. Ascentium is informed and believes and thereon alleges that Washworld contends that CWM sent the $176,552.71 back to CWM because Williams represented that this money was to buy additional equipment from another vendor or supplier and not Washworld. At no time did anyone at Washworld make inquiry of Ascentium regarding the reason for the Mistaken Payment, what equipment or purchase order or contract number it related to, or whether the amount or any of it should be returned to Ascentium despite the requirement to do so under the Funding Instructions. Instead, Washworld concealed the true facts from Ascentium.

23. 22. On or about May 23, 2024, Pete Matheny of Ascentium sent to Washworld a copy of the Quote (Exhibit "2") on Washworld's form that had been received from Williams. Washworld never responded in any fashion, did not inform Ascentium that such the Quote or any similar quote had been issued by or provided to Washworld and did not inform Ascentium of the facts alleged in paragraph 20 until on or about September 26, 2024, in response to further follow up from Pete Matheny.

24. 23. Once Ascentium became fully aware of the facts as it knows them now, Ascentium i) declared the EFA in default and accelerated the entire balance of the loan by making demand for immediate payment of the entire loan balance upon CWM, WCCW and Ortiz via the Notice of Default and Acceleration letter ("Acceleration Letter"), and ii) contact Washworld in an attempt to obtain the return of the Mistaken Payment.

25. 24. CWM, WCCW and Ortiz failed and refused to pay the accelerated balance or to respond to the Acceleration Letter.

26. 25. Washworld failed and refused to respond to Ascentium's attempts to request return the Mistaken Payment and is informed and believes and thereon alleges that Washworld

5443173v25852240v1 | 100287-0289

8

COMPLAINT

actually concealed the true facts regarding the additional $176,552.71 sent to CWM as set forth below.

## FIRST CAUSE OF ACTION

### (Against CWM for Breach of EFA)

27. Ascentium incorporates herein by this reference, paragraphs 1-25, Inclusive, as though fully set forth at length.

28. Ascentium has performed all terms, conditions, covenants, and promises on its part required to be performed in accordance with the terms of the EFA as amended and all other related documents and instruments executed in connection therewith.

29. Debtor defaulted by breaching many of the covenants set forth in paragraphs 2, 6 and 10 of the EFA based on its conduct set forth above and also failed to make the payments due on the EFA from and after October, 2024. Ascentium has elected to accelerate and declared the entire balance of the EFA immediately due and payable. The accelerated amount due as of October 30, 2024, is as follows:

| | |
|---|---|
| Past Due Payments: | $17,478.45 |
| Late Charges: | 648.72 |
| Insurance Charges for insurance Debtor failed to obtain: | 499.94 |
| Future Payments Accelerated (3% value discount applied) | 393,891.05 |
| TOTAL | $350,997.00 |

Interest accrues on the amount due at the rate of $172.53 per day from and after October 30, 2024 until payment in full or date of entry of judgment. On October 30, 2024, the Acceleration Letter was sent to Debtor and all guarantors (1) demanding payment of the amounts due and (2) possession of the Equipment. Debtor and (as alleged below) all guarantors have failed and refused to pay the amounts due and owing as alleged herein and, on information and belief, there is no equipment to turn over to Ascentium. A true and correct copy of the Acceleration Letter is attached hereto, marked Exhibit "6" and is incorporated herein by this reference.

30. Ascentium is informed and believes and therein alleges that none of the Equipment that was to be financed by the EFA was delivered to or received by the Debtor, which is another breach of the EFA and that the representation made by Ortiz that the Equipment had

5443173v25852240v1 | 100287-0289

9

COMPLAINT

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

been received was false.

31. ~~30.~~ Ascentium has not yet repossessed any Equipment, nor will it likely be able to since the Equipment referred to in the Order probably did not exist and this Complaint is not for a deficiency.

32. ~~31.~~ Pursuant to the EFA, Ascentium is entitled to recover its reasonable attorney fees and costs in enforcing its rights thereunder.  Ascentium has employed counsel and has incurred and will in the future incur reasonable attorneys fees and costs to be set by the Court according to proof.

### SECOND CAUSE OF ACTION

### (For Breach of Guaranty against Defendant Ortiz)

33. ~~32.~~ Ascentium incorporates herein by this reference paragraphs ~~1-30~~ 1-32, inclusive, as though fully set forth and length.

34. ~~33.~~ In connection with Debtor executing and delivering the EFA, Ortiz made, executed, and delivered to Ascentium his Personal Guaranty, Agreement No. 2763169, dated January 5, 2024 (the "Ortiz Guaranty") of the obligations of Debtor under the EFA, a true and correct copy of which is attached hereto as Exhibit "7" and incorporated herein by this reference.

35. ~~34.~~ Ascentium has performed all terms, conditions, covenants, and promises on its part required to be performed pursuant to the terms of the Ortiz Guaranty.

36. ~~35.~~ Demand has been made on Debtor and Ortiz to pay all sums due to Ascentium, but Debtor and Ortiz have failed to do so.  As a result, Ascentium has declared the Ortiz Guaranty to be in default and has made demand on Ortiz to pay the full amount due pursuant to the terms of the EFA and the Ortiz Guaranty, but Ortiz has failed to do so.

37. ~~36.~~ As a result of the foregoing, Ascentium is entitled to recover all amounts alleged to be due under the EFA in paragraph 25 above in at least the sum of $350,997.00 plus interest, in an amount according to proof.

38. ~~37.~~ Pursuant to the Ortiz Guaranty, Ascentium is entitled to recover its expenses, including reasonable attorney's fees in enforcing the Ortiz Guaranty.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

**THIRD CAUSE OF ACTION**

**(For Breach of Guaranty against WCCW)**

39. Ascentium incorporates herein by this reference paragraphs 1-39, Inclusive, as though fully set forth and length.

40. In connection with Debtor executing and delivering the EFA, WCCW made, executed, and delivered to Ascentium its Guaranty, Agreement No. 2763169, dated January 5, 2024 (the "WCCW Guaranty") of the obligations of Debtor under the EFA, a true and correct copy of which is attached hereto as Exhibit "8" and incorporated herein by this reference.

41. Ascentium has performed all terms, conditions, covenants, and promises on its part required to be performed pursuant to the terms of the WCCW Guaranty.

42. Demand has been made on Debtor and WCCW to pay all sums due to Ascentium, but Debtor and WCCW have failed to do so. As a result, Ascentium has declared the WCCW Guaranty to be in default and has made demand on WCCW to pay the full amount due pursuant to the terms of the EFA and the WCCW Guaranty, but WCCW has failed to do so.

43. As a result of the foregoing, Ascentium is entitled to recover all amounts alleged to be due under the EFA in paragraph 25 above in at least the sum of $350,997.00 plus interest but in an amount according to proof.

44. Pursuant to the WCCW Guaranty, Ascentium is entitled to recover its expenses, including reasonable attorneys' fees in enforcing the WCCW Guaranty.

**FOURTH CAUSE OF ACTION**

**(For Fraud/Concealment against CWM, Williams, and Ortiz and Does 1-10 Inclusive)**

45. Ascentium incorporates herein by this reference paragraphs 1-44, inclusive, as though fully set forth and length.

46. CWM, through Williams and Ortiz, represented to Ascentium that CWM intended to order the Equipment stated in the Quote, Exhibit 2 hereto, the purchase of which would be the subject of the EFA, as amended by Exhibit "3".

47. The representation was false when made; the true facts were that Williams and

Ortiz never intended to cause CWM to order the Equipment listed in the Quote.

48. In addition, and in connection with the fraud, Ortiz orally represented to Ascentium that the Equipment had been delivered when in fact it was never delivered to perpetuate and conceal the fraud.

49. 47. The representation was representations were made with the intent to induce Ascentium to make the Mistaken Payment to Washworld, so that they could cause Washworld to apply a portion thereof to the outstanding invoice for another customer of CWM and to send the balance to CWM as working capital or for whatever other reason CWM needed the money for. but nothing to do with the Equipment or the EFA. In addition, Plaintiff is informed and believes and thereon alleges that in order to conceal why the $176,552.71 was being remitted from Washworld to CWM, it was structed by Washworld and the Defendants herein as a commission paid on the Conserv Fuels Order.

50. 48. In reliance on the representation representations, Ascentium made the Mistaken Payment to Washworld,  Ascentium's reliance was reasonable in view of (a) Ascentium's history in dealing with CWM and Washworld, (b) the history of the EFA transaction where CWM apparently ordered equipment from AVW which refunded the payment previously made by Ascentium to AVW, (c) CWM's status as a distributor of Washworld which, among other things, provided CWM with access to Washworld's order forms, (d) the apparent bonafides of the Quote, (e) CWM obligating itself under the EFA as amended to pay the amounts due thereunder, which was personally guaranteed by Ortiz and WCCW, and (f) the contractual obligation of Washworld to contact Ascentium if there were any questions regarding payments. and (g) the transaction was handled as prior transactions with Washworld sending the Payment Notification along with the $309,054.52 wired to Washworld; (h) that in most of the Washworld transactions the Order forms were not signed by Washworld and the custom and practice and course of dealing with Washworld in previous transactions was no different as in this transaction.

51. 49. Had Ascentium known the true facts, it never would have made the Mistaken Payment to Washworld or entered into the EFA.

52. 50. As a direct and proximate result of Ascentium's reliance on the fraudulent misrepresentation misrepresentations, Ascentium has been damaged in the amount of the Mistaken Payment plus interest thereon from and after the date of payment.

53. 51. The conduct of CWM, Williams, Ortiz, as its managing agents, was done with oppression, fraud and malice within the meaning of Civil Code § 3294. As managing agents and officers and/or members Williams and Ortiz had the authority to act on behalf of CWM. Ascentium is therefore entitled to recover punitive and exemplary damages from each of such defendants in an amount according to proof.

### FIFTH CAUSE OF ACTION

**(Against Washworld for Recovery of Money Paid by Mistake)**

54. 52. Ascentium incorporates herein by this reference paragraphs 1-51 1-52, Inclusive, as though fully set forth and length.

55. 53. As alleged herein, Ascentium was fraudulently induced to make the Mistaken Payment to Washworld.

56. 54. Upon receipt of the Mistaken Payment, Washworld knew, had reason to know, and/or should have known, the Payment was, in fact, mistaken and was not on account of any then-pending transaction, because of, among other things, the following: (a) there was then pending no order from CWM with a payment due from CWM in the amount of the Mistaken Payment or in an amount even remotely similar to that amount, (b) the receipt of the Mistaken Payment in fact caused Washworld to question what it was for and to make inquiry of CWM as to what obligation it was related to, (c) instead of following the instructions in the Payment Notice to direct any questions regarding the payment referred to therein to Ascentium, Washworld made the conscious and intentional decision to not do so but to direct questions to CWM even though the Mistaken Payment was paid by Ascentium to Washworld, (d) instead of following the requirements of the Funding Instructions, Washworld made the conscious and intentional decision not to contact Ascentium regarding same; (e) in all its prior dealings on transactions funded by Ascentium, Washworld had never received a payment that it did not readily associate with a

5443173v2 5852240v1 | 100287-0289

13

COMPLAINT

known pending transaction involving equipment that was being sold, (f) on information and belief, Washworld had never before received a payment on account by a purchase order for an Ascentium transaction or transaction involving CWM ~~in any capacity~~as the borrower, or relating to any other distributor as the borrower, or direct sale that was over double the amount owed on the transaction to which it was applied, (g) on information and belief, Washworld was not expecting a funding from Ascentium at the time in any amount let alone the amount of the Mistaken Payment, (h) on information and belief, Washworld knew that purchases of its products were funded by loans or leases that were intended to be secured by the equipment being purchased, thus sending more than 50% of the purported overpayment to the customer instead of the lender, could well be contrary to the contractual relationship between the customer and the lender, (i) on information and belief, Washworld had never before been confronted with a situation where it had received a payment from a vendor's financing source where the customer being financed requested that more than 50% of the amount received be returned not to the funding source but to the intended obligor, (j) on information and belief, Washworld received no reasonably credible explanation from CWM as to why the amount of the Mistaken Payment was more than twice what was owed on the obligation of CWM's customer Conserv Fuels, to which the payment was applied or a credible explanation for the request that the overage be paid to CWM rather than returned to Ascentium and (k) the Mistaken Payment was larger than any prior payment received from Ascentium.

57. ~~55.~~ Washworld retained the Mistaken Payment in bad faith and with reason to know that it was Mistaken and without complying with its obligation to make inquiry under the Funding Instructions and the request that was contained in the Payment Notice. Moreover, Plaintiff is informed and believes that the additional $176,552.71 remitted back to CWM and contrary to what the Funding Instructions required Washworld to do with the money and then accounted for this $176,552.71 as a commission paid by Washworld to CWM rather than what Washworld stated to Ascentium the reason was why this money was remitted back to CWM which was to buy ancillary equipment.

58. ~~56.~~ By reason of the foregoing and by the conduct of Washworld in this

~~5443173v2~~5852240v1 | 100287-0289

14

COMPLAINT

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

transaction, in order to avoid an unjust enrichment of Washworld, Ascentium is entitled to restitution from Washworld of the entirety of the Mistaken Payment plus interest thereon from and after the date of the Mistaken Payment in an amount according to proof.

## SIXTH CAUSE OF ACTION

### (Against Washworld for Breach of Contract)

59. 57. Ascentium incorporates herein by this reference paragraphs 1-56 1-58, inclusive, as though fully set forth and length.

60. 58. Pursuant to the Funding Instructions, Exhibit "4", Washworld was contractually obligated to remit the Mistaken Payment to Ascentium by reason of the fact that at the time of Washworld's receipt of same, there existed no valid purchase order, invoice, quote or proposal to which the Mistaken Payment related and thus same constituted funds to which Washworld, as payee, was not entitled, all as Washworld knew, had reason to know or should have known.

61. 59. Ascentium is informed and believes and therein alleges that when it received the Mistaken Payment, Washworld employees in fact had questions as to why same had been received.  Instead of directing the questions to Ascentium, Washworld directed same the questions to CWM,  and Williams, and/or possibly to Ortiz and, based on statements from the these defendants, Washworld applied a portion of such funds to payment of an invoice it knew, had reason to know, or should have known, was not the intended subject of the Mistaken Payment and remitted the balance to CWM, by and through Williams and/or Ortiz.

62. 60. To the extent there were conditions to be performed by Ascentium in connection with the Funding Instructions such conditions, covenants and promises were performed by Ascentium.

63. 61. As a direct and proximate result of Washworld's breach of the Funding Instructions, Ascentium has been damaged in the amount of the Mistaken Payment and is thus entitled to recover the full amount thereof from Washworld plus interest thereon from and after the date of the Mistaken Payment in an amount according to proof.

**SEVENTH CAUSE OF ACTION**

**(For Money Had and Received Against Washworld)**

64. ~~62.~~ Ascentium incorporates herein by this reference paragraphs 1-58, inclusive, as though fully set forth and length.

65. ~~63.~~ Within the two years last past, Washworld became indebted to Ascentium for money had and received for the use and benefit of Ascentium in the amount of the Mistaken Payment, no part of which has been paid. As a result, Ascentium is entitled to the amount of the Mistaken Payment together with interest thereon from and after the date of the Mistaken Payment in an amount according to proof.

**EIGHTH CAUSE OF ACTION**

**(For Conversion as Against Washworld and Does 1-10)**

66. Plaintiff refers to paragraphs 1-52, and 54-58, Inclusive, by reference as if set forth in full.

67. Plaintiff entered into the EFA with CWM which EFA was guaranteed by Ortiz and WCCW to make payments for the delivery of the Equipment which was collateral for the loan evidenced by the EFA.

68. Washworld had executed the Funding Instructions with Ascentium so that in any transactions where it was the supplier of equipment, the loan proceeds for the borrower would be paid not to the borrower but to Washworld as the supplier in accordance with the terms of the Funding Instructions.

69. As stated above, in accordance with the EFA, the Commencement Agreement, the verbal verification that was done by Ortiz representing the Equipment was delivery and received and Ascentium was instructed to pay the $309,054.52 to Washworld.

70. Washworld was paid the $309,054.52 on or about March 12, 2024, and also received the Payment Notification setting forth why this sum was being paid to Washworld. At no time after the $309,054.52 was paid to Washworld was Ascentium contacted by Washworld as to why this payment was received from Ascentium. Instead, Washworld contends that it contacted

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

Williams who instructed Washworld to apply the $132,509.09 to the Conserv Fuels alleged outstanding order and the $176,552.71 was remitted to CWM and never paid to Ascentium.

71.    At all times herein mentioned Ascentium was not a volunteer in paying the $309,054.52 to Washworld or for the acquisition for the Equipment which never existed or was ordered.

72.    Conversion is the wrongful act of dominion over the property of another. There does not have to be a wrongful intent but only that a defendant acted knowingly that it was not entitled to use or possession of property and any interference with the right to possession of another's property constitutes a conversion.

73.    At the time that the $309,054.52 was wired to Washworld, and Washworld contended that it did not know why this money was sent to Washworld it contended that it did not know why it was sent by Ascentium even though it had the ability to contact Ascentium by and through Marie Negri or anyone else and also refer to the Finance Contract # on the Payment Notification.  Moreover, Washworld had received many such Payment Notifications from Ascentium in the past and Ascentium is informed and believes and thereon alleges that it did not ever have any such issues with Washworld in the past. And the Funding Instructions specifically state that the funds must be tied to a specific transaction or Order and the payment made by Washworld thereafter was not in accordance with the terms of the Funding Instructions.

74.    Instead, the money was converted by Washworld by first paying on a different Order and it got the benefit of being paid on an Order that the money was not intended for. Second, Ascentium is informed and believes and thereon alleges that it used the $176,552.71 to pay a commission to CWM which was a further direct benefit to Washworld.

75.    As a result of the conversion of the $309,054.52 Washworld converted this property which was not provided to Washworld for anything other than selling the Equipment to CWM with the loan proceeds furnished by Ascentium to Washworld and was used for Washworld's benefit. Therefore, Plaintiff is entitled to the sum of $309,054.52 together with interest thereon at the legal rate from and after March 12, 2024, in an amount according to proof.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

WHEREFORE, Ascentium prays for judgment against Defendants, and each of them, as follows:

**On the First, Second and Third Causes of Action**

1. For the principal sum of $350,997.00 which also includes late charges;

2. For interest in the sum of $172.53 per day from and after October 30, 2024, until paid in full or date of entry of judgment;

3. For further late fees in an amount according to proof;

4. For reasonable attorneys fees in an amount according to proof;

**On the Fourth Cause of Action**

5. For damages in the amount of $309,054.52;

6. For interest at the legal rate from March 12, 2024 until date of entry of judgment in an amount according to proof;

7. For punitive and exemplary damages in an amount according to proof;

**On the Fifth Cause of Action**

8. For restitution in the amount of $309,054.52;

9. For interest at the legal rate on all damages according to proof;

**On the Sixth ~~Cause~~and Eighth Causes of Action**

10. For damages in the amount of $309.054.52;

11. For interest at the legal rate on all damages according to proof;

**On the Seventh Cause of Action**

12. For damages in the amount of $309.054.52;

13. For interest at the legal rate on all damages according to proof;

**On All Causes of Action**

14. For costs of suit incurred herein; and

15. For such other and further relief as the Court deems just and proper.

~~5443173v2~~5852240v1 | 100287-0289

18

COMPLAINT

DATED: ~~January 6~~February 20, ~~2025~~2026

FRANDZEL ROBINS BLOOM & CSATO, L.C.
~~ANDREW K. ALPER~~
~~THOMAS M. ROBINS III~~


By: _____
ANDREW K. ALPER
Attorneys for Plaintiff REGIONS BANK, an Alabama State Bank and as Successor by Merger to ASCENTIUM CAPITAL, LLC

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

| Summary report: Litera Compare for Word 11.10.1.2 Document comparison done on 2/20/2026 1:27:56 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://aws-sql02.frandzel.com/FRBC_IMAN_LA/5443173/2 | |
| **Modified DMS:** iw://aws-sql02.frandzel.com/FRBC_IMAN_LA/5852240/1 | |
| **Changes:** | |
| Add | 138 |
| Delete | 80 |
| Move From | 1 |
| Move To | 1 |
| Table Insert | 1 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 221 |